Helen Gibbs, Plaintiff-Appellee, v. The Procter & Gamble Manufacturing Company, a Corporation, Defendant-Appellant, and The Great Atlantic and Pacific Tea Company, Defendant.

Gen. No. 64–3.

Fifth District.

September 11, 1964.

Rehearing denied October 5, 1964.

Wagner, Connor, Ferguson, and Bertrand & Baker, of East St. Louis (Francis D. Conner, John M. Ferguson, William L. Blum, and William F. Hunting, Jr., of counsel), and Dinsmore, Shohl, Barrett, and Coates & Deupree, of Cincinnati, Ohio.

Wiseman, Hallett, and Mosele & Keehner, of Alton, for appellee.

WRIGHT, JUSTICE.

This is a suit by plaintiff, Helen Gibbs, to recover damages from defendant, The Procter & Gamble Manufacturing Co., a Corporation, for injuries plaintiff alleges she received as a result of using the washing product "Cheer." Plaintiff alleges that this product was negligently manufactured by defendant and defendant did not make proper inspection and testing of its product. The jury returned a verdict in favor of the plaintiff against the defendant, The Procter & Gamble Manufacturing Co., a Corporation, for $6,500, on which the court entered judgment, from which judgment defendant appeals.

Plaintiff also sued the Great Atlantic and Pacific Tea Company, from whom the Cheer was purchased, on a breach of warranty theory. The jury returned a verdict against the plaintiff on that claim and the court entered judgment thereon in favor of the defendant, The Great Atlantic and Pacific Tea Company, from which judgment plaintiff has not appealed.

The plaintiff was 58 years of age at the time of trial and had been in the restaurant business for about eighteen years in Collinsville, Wood River and Alton, Illinois. She first opened a restaurant in Alton in 1956. The restaurant had room in the front for approximately thirty to thirty-five people, had a kitchen in the rear and plaintiff and her husband lived upstairs above the restaurant.

Plaintiff did most of the work in connection with operating the restaurant in Alton from 1956 until January of 1961. In connection with the operation of the restaurant, plaintiff did all of the buying and cooking. She peeled potatoes, apples, oranges and onions and other fresh vegetables and prepared all of the meat for cooking. She did all of the cleaning and waxed the linoleum floors when they required it. She also in connection with the operation of the restaurant washed dishes, pots and pans.

471

The plaintiff started using powdered Cheer as a washing product in the restaurant in 1956 and continued to use it regularly until the first week in February, 1960. During the same period of time, she used Charles Antell Shampoo about once each week to wash her hair and used Palmolive Soap for toilet and bathing purposes.

During the first week in February 1960, she began having difficulty with the skin of her hands. The area affected was principally the back of her right hand, the left hand being affected to a lesser degree. The affected areas were chapped, red and itched. She stated that she had never had any difficulty with her hands before this time.

Plaintiff went to see Dr. Raymond Simpson, a dermatologist in Alton, Illinois, for the first time on February 12, 1960, about her hands. He gave her an injection, lotion to use on her hands and medication, and advised her to use rubber gloves over cotton gloves when she immersed her hands in water. Plaintiff was suspicious of Cheer being the cause of her skin condition and from the first time she saw Dr. Simpson, she discontinued using the product Cheer and never used it thereafter, and began using a soap called Vel.

Plaintiff's hands cleared up after the first visit to the doctor, and she did not keep an appointment she had made with him for February 19, 1960, because the condition of her hands were improved. On March 11, 1960, she had a flare-up of the condition of her hands and went back to see Dr. Simpson. She had not used the product Cheer before this flare-up, and in fact, never used that product again after February 12, 1960. She had shampooed her hair with Charles Antell Shampoo several times between February 12, and March 11, 1960, and the shampoo did cause her some irritation when she was using it.

Dr. Simpson testified that he first saw plaintiff on February 12, 1960, and that her primary complaint

at that time consisted of an acute dermatitis of the hands and forearms and scattered areas about the shoulder and neck. He further testified that he did not see plaintiff again until March 11, 1960, and at that time she had had a flare-up involving the same essential areas. He saw here again on March 18, 1960, when she was greatly improved and did not see her again until January 27, 1961. He stated that she then had acute dermatitis involving the right hand which was characterized by redness, swelling and oozing from the irritated areas. He saw her twenty-five times during 1961, eleven times during 1962, and last saw her in February, 1963. The doctor further stated that his first diagnosis of plaintiff's case was acute contact dermatitis, and after her return in 1961, he continued to give her ointments, medication and gave her medicine to help nervous tension because emotional tension could be a factor in continuing the dermatitis. He further stated that during that time he would have called her condition a chronic localized form of neurodermatitis and not contact dermatitis.

Dr. Simpson after describing the ingredients in Cheer was asked the following question: "Now, the condition that you found in Helen Gibbs, doctor, when you first saw her and during the course of her subsequent treatment by you, might that, within a reasonable degree of medical certainty and scientific certainty, might that be caused by the product that I have just listed?" The doctor answered in the affirmative and then explained his anwer in the following manner: "From the appearance of the eruptions I think she had, in my opinion, she had a contact dermatitis which means I felt it was something that had gotten on her skin which had produced the irritation, something from the outside that was the origin of her trouble. The fact that she had been working with detergents, according to my record, I thought that was a very likely possibility. . ." The doctor

further testified that there are many substances to which Mrs. Gibbs would be exposed in the operation of a restaurant which could produce irritations sufficient to cause the type of skin eruptions she had. Peeling certain fruits and vegetables, substances used in cleaning toilet facilities or unplugging stopped drains, articles of clothing, reaction to drugs and that sort of thing all could cause skin eruptions of the type he observed on Mrs. Gibbs. The doctor's working diagnosis was that her skin did not tolerate detergents, without reference to any particular brand of detergent. There is nothing about the product Cheer that would make her more suspectable to that product than to any other washing or detergent product made by the same company or a different company, in the opinion of Dr. Simpson.

Dr. Edward Burkhart testified that he examined the plaintiff, Helen Gibbs, at the request of the defendant on September 6, 1962, and determined that Mrs. Gibbs had a dermatitis of her right hand, a small amount of dermatitis of the left hand, a dermatitis of the right thumb and a dermatitis under the left breast. He stated that this type of skin condition could be precipitated by many and varied chemical irritants, everything from water, possible soaps, fruit, vegetables, fruit and fruit juices, dyes found in food, cosmetics, multiple cleaning agents, bleaches, waxes and polishes, and further stated that in his opinion there were no soaps or detergents that were the direct or primary cause of plaintiff's dermatitis.

Defendant's witnesses were familiar with the product, Cheer, the ingredients that went into it and the method of manufacturing it. It was established that the defendant has been in the business of making soaps and detergents since 1939 and that the defendant company produces roughly 50% of all household washing and cleaning products that are sold in this country. Defendant's evidence was to the effect that

Cheer is manufactured in a continuous manufacturing process, with continuous checks and inspections to insure that the product is produced as designed, and all of the ingredients used and the final product Cheer are highly safe products for general washing and cleaning purposes.

Harry Whitehouse, the director of defendant's skin testing laboratory, testified that the laboratory under his direction and control, had tested the product both before it was placed on the market, and repeatedly after it was placed on the market, to determine its effect on the human skin. Patches of the substance were placed on the upper back or arms of subjects and left for varying periods of time to determine if there was any reaction of the skin. In other tests, the arms of subjects were washed with the product and the solution left on the arms to determine the effect on the skin. In another test the subject's arms were immersed in solutions of the substance Cheer and the reaction of the skin noted. In addition to the laboratory tests, the product was tested by women selected from church and lodge groups in ordinary household usage, under such conditions that they could not identify the product used, and the effect on the skin was noted both by the ladies taking part in the test and by independent dermatologists in the localities involved who examined the women testing the product both before and after the use of the product. Whitehouse further stated that some 40,000 persons have been tested to determine the effect of Cheer on the human skin, by one or more of the type of tests listed. In all of those tests, no case of contact dermatitis due to Cheer was found, and Cheer was determined to be a safe household washing product.

The defendant seeks reversal of the verdict and judgment against it on the following grounds: There is no privity of contract between the plaintiff and defendant; there is an absence of any proof of negli-

gence on the part of the defendant; and there is no evidence that "Cheer" was the proximate cause of plaintiff's injuries.

■ Under Illinois law, a manufacturer is not liable in damages to persons with whom it has no privity or contractual relations for personal injuries or damages to property sustained by such persons because of the alleged negligent manufacture of a product, except where the product is inherently or imminently dangerous and except where, though not inherently or imminently dangerous, its nature is such that it may become so if negligently manufactured. Rotche v. Buick Motor Co., 358 Ill 507, 193 NE 529; Day v. Barber-Colman Co., 10 Ill App2d 494, 135 NE2d 231; and, Dittmar v. Ahern, 37 Ill App2d 167, 185 NE2d 264. Another exception is where the manufacturer's negligence consists of a fraudulent or deceitful statement or misrepresentation about the product. Miller v. Sears Roebuck & Co., 250 Ill App 340.

The plaintiff makes the blanket statement that there is now strict tort liability imposed upon the manufacturer regardless of privity or negligence or warranty and in support of this contention cites and discusses at length in his brief the recent case of Suvada v. White Motor Company and Bendix-Westinghouse Automotive Air Brake Co., First District, Appellate Court of Illinois, 51 Ill App2d 318, 201 NE2d 313.

We do not agree with plaintiff's interpretation of this case. In that case, there was involved a defective braking system upon a motor vehicle and the court stated in its opinion, "a product that is inherently dangerous or defectively made constitutes an exception to the requirement of privity in an action between the user of the product and its manufacturer. . . . The complaint alleges that Bendix manufactured an inherently dangerous or defectively made brake system which was installed by White into a motor vehicle as

476

part of its renovation. . . . A motor vehicle that is operated on the highways with a braking system that is inoperative is obviously dangerous to life and limb."

It is clear from the record before us that the plaintiff had no contractual relations with the defendant, The Procter & Gamble Manufacturing Co., a Corporation, and there was no privity between these parties. The undisputed evidence shows that the plaintiff bought the product Cheer from the Great Atlantic and Pacific Tea Company, the retailer, and that she bought nothing whatever directly from the defendant, The Procter & Gamble Manufacturing Co., a Corporation.

From a careful review of the evidence in the record before us, it is clear that the product Cheer is neither inherently, imminently or normally dangerous. It is a detergent which is used primarily for washing clothes and dishes. The record also reveals that none of the ingredients contained in Cheer are dangerous. These ingredients are in general use throughout the soap and detergent industry.

The fact that the plaintiff reported an injury to her hands and arms does not authorize a presumption or inference that the defendant was negligent. The burden was upon the plaintiff to prove by competent evidence, direct or circumstantial, that the defendant was guilty of negligence as alleged in her amended complaint. Rotche v. Buick Motor Co., supra. The rule is well stated in Day v. Barber-Colman Co., supra, where the court said: "And in those accepted cases where, regardless of the presence or absence of contractual relations or privity, there may possibly be a liability, the mere fact that an accident resulting in an injury to person or property occurs does not authorize a presumption or inference that the manufacturer of the product was negligent; the burden is on the plaintiff to prove by competent evidence, direct

477

or circumstantial, that the manufacturer was negligent in the manufacture of the product.

The plaintiff in the case before us produced no evidence that the defendant was negligent in the preparation, manufacture or testing of Cheer. There is no evidence that the defendant failed to adopt safeguards commonly utilized in the detergent industry. The evidence in the record establishes only that the plaintiff suffered from a skin irritation originally diagnosed by her doctor as contact dermatitis, which diagnosis was later changed to chronic neuro-dermatitis, but there is nothing in the record to establish that the defendant manufacturer of Cheer was guilty of any acts of negligence in manufacturing the product which caused plaintiff's injury.

As a prerequisite to recovery, the plaintiff must show a definite causal relation between her injury and defendant's product, Cheer. An injury is no evidence of negligence and does not warrant an inference that one or two or more possible causes was the proximate cause of the injury. Shaw v. Swift & Co., 351 Ill App 135, 114 NE2d 330; Rotche v. Buick Motor Co., supra.

The circumstances of the injury in question as described by plaintiff, and the expert medical testimony do not give rise to a legitimate inference that the dermatitis was proximately caused by the use of Cheer, anymore than it could be inferred with equal plausibility and probability that the skin condition resulted from the use of Charles Antell Shampoo, from the use of Palmolive Soap, from peeling potatoes, from preparation of onions, fruits and other vegetables, from prolonged immersion of the hands in warm or hot water, from waxing linoleum floors, from consumption of certain foods, from use of drugs prescribed by doctors, or from nervous tension.

We conclude from the evidence in the record before us that the plaintiff failed to prove by a pre-

ponderance of the evidence that there was any contractual relation or privity between the plaintiff and the defendant; failed to prove that the product Cheer is inherently, imminently or normally dangerous, or failed to prove that the defendant was in any way negligent in the manufacturing of said product, and failed to prove any casual relation between her injury and defendant's product Cheer.

For the reasons stated the judgment of the trial court against the defendant, Procter & Gamble Manufacturing Company is reversed.

Judgment reversed.

DOVE, P. J. and REYNOLDS, J., concur.