St. Paul Fire & Marine Insurance Company, Plaintiff-Appellee, *v.* Michelin Tire Corporation *et al.*, Defendants-Appellants.

(No. 55260;

First District (2nd Division)—May 15, 1973.

*Rehearing denied June 5, 1973.*

James B. O'Shaughnessy and Sheldon A. Zabel, of Schiff, Hardin, Waite, Dorschel & Britton, of Chicago, for appellant Michelin Tire Corporation.

Joseph B. Lederleitner, of Pretzel, Stouffer, Nolan & Rooney, of Chicago, for appellant Smith Tire Company.

Howard & French, of Chicago, (Richard G. French, Stuart N. Litwin, and Gary E. Dienstag, of counsel,) for appellee St. Paul Fire and Marine Insurance Company.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This is an indemnity action which seeks recovery of sums paid in settlement to the estates of four individuals killed in a 1962 collision between the car in which they were riding and a truck operated by plaintiff's insured. The case was tried upon a theory of strict liability in tort for the manufacture and sale of a defective product. After a bench trial judgment for plaintiff was entered in the stipulated amount of $39,000. Two contentions are raised on appeal: (1) that plaintiff's failure to give notice to defendants prior to settling the initial litigation imposed upon plaintiff the duty to subsequently prove the liability of its insured (in order to avoid the status of a volunteer) and the reasonableness of the settlement, and that such burden was not met; (2) that the evidence on the issue of a manufacturing defect required a finding in favor of defendants, or, in the alternative, that the finding in favor of plaintiff on that issue was contrary to the manifest weight of the evidence.

On August 29, 1962 a truck operated by an employee of the Pillsbury Company (hereinafter referred to as Pillsbury) collided head-on with an automobile occupied by four individuals, all of whom were killed. The immediate cause of the collision was apparently a blowout in the truck's front left tire, causing the truck to swerve into the path of the oncoming car. The tire in question was manufactured by defendant Michelin Tire Corporation (hereinafter referred to as Michelin) and sold by defendant Smith Tire Company (hereinafter referred to as Smith). Lawsuits on behalf of the estates of each of the deceased occupants were filed in the Circuit Court of Cook County against Pillsbury, the driver of the truck and the lessor of the truck.[1] The complaints alleged numerous

---

[1] *Davis v. Lebschier*, 63 S 8799, *Allen v. Pillsbury Company*, 64 L 1005 and *Gore v. Lebschier*, 63 S 22352.

negligent and careless acts and omissions, including failure to maintain the truck in a safe operating condition and failure to equip the truck with safe tires. Pillsbury and its insurance carrier, St. Paul Fire and Marine Insurance Company, settled all these claims for the total amount of $38,950. Subsequently, Pillsbury filed a complaint for indemnity against defendants, alleging that the tire on the truck was defective and was the proximate cause of the collision. In a second amended complaint, St. Paul Fire & Marine Insurance Company, which had paid the entire settlement, was substituted as plaintiff.

*OPINION*

Defendant's first contention is that the settlement of the initial lawsuit, without notice to the prospective indemnitors, imposed upon plaintiff the burden of proving that plaintiff's insured was in fact liable to the four estates and that the settlement amounts were reasonable. It is asserted that this burden, in addition to the burden of proving the primary liability of the indemnitor, is assumed by any party who voluntarily pays a settlement without such notice. No direct authority is cited for this proposition, and our research has uncovered no case concerning the precise issue. It is a matter of first impression in Illinois.

■■■ We hold that, in addition to proving the primary liability of the indemnitor for the injury occasioning a settlement, an indemnitee who settles without notice to the prospective indemnitor need prove only that, by settling, he was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer. The reasonableness of the amounts paid in settlement is a matter bearing solely upon the issue of damages.

That a party in plaintiff's posture need not prove his or his insured's negligence, but need only establish potential liability, is supported by case law and by policy considerations. In *Sleck v. Butler Brothers*, 53 Ill.App.2d 7, 202 N.E.2d 64, an injured workman sued the owners of the building in which he had been injured and the general contractor for the job on which he had been working. The complaint alleged general negligence and violation of the Structural Work Act. Defendants filed third party complaints against plaintiff's immediate employer, seeking indemnity on a theory of active-passive negligence. After giving notice to the employer, defendants settled with plaintiff, and an appropriate consent order was entered. The indemnity action proceeded to a bench trial and a directed verdict for third party defendant. On appeal, third party defendant asserted that the judgment in its favor was justified by the gratuitousness of the settlement by third party plaintiffs; that the evidence clearly showed that third party plaintiffs were not "in charge" of the operation in which plaintiff had been injured and could

not have incurred liability. In rejecting this contention, the appellate court enunciated and applied the appropriate rule as follows:

"[T]he third-party plaintiffs are not volunteers; a party may seek contribution even though it has not been judicially determined that it is liable to the injured party. The Sack and Gulf cases heretofore cited are in point. It is necessary only that the person seeking contribution has been subjected to liability because of the wrongful conduct of another. In Boston v. Old Orchard Business Dist., Inc., 26 Ill.App.2d 324, 329, 168 N.E.2d 52 (1960), the court stated:

'Whether the legal principle upon which the third party complaint is based is contribution or indemnity, in either case the fact that a party against whom a legal liability is asserted made a fair settlement in good faith without a judgment having been entered against him does not prevent his seeking to enforce a claim for reimbursement against another person primarily responsible for the injury suffered by the plaintiff. \* \* \*'

In the instant case the third-party plaintiffs were subjected to tort liability by the wrongful acts of the third-party defendant. Third-party plaintiffs Butler and Canal owned the building and had inspected the elevator before the third-party defendant began its work at the building. Third-party plaintiff Gallaher had contracted with the owners of the building to do the work in question and then subcontracted that work to the third-party defendant. These circumstances could reasonably be considered to create a question of fact as to whether the third-party plaintiffs were technically responsible for the work being done and technically liable to Sleck for failing to discharge a supervisory responsibility even though they were not guilty of any active common law negligence or any active violations of the Structural Work Act."

53 Ill.App.2d 7, 17—18.

Defendants have offered no cogent reason why an indemnitee's failure to give pre-settlement notice to a prospective indemnitor would warrant a different approach. See also, *Allied Mutual Casualty Corp. v. General Motors Corp.* (10th Cir.), 279 F.2d 455; *Popkin Bros. Inc. v. Volk's Tire Co.*, 20 N.J. Misc. 1, 23 A.2d 162.

■■ We see no way in which plaintiff's settlement either did or could prejudice defendants by depriving them of any defenses, whether negative or affirmative, which would otherwise have been available to them; that situation, of course, would be a very different matter. Our position is further supported by the established tenet that the law favors the amicable compromise and settlement of litigation. (I.L.P. Compromise

and Settlement par. 2) A defendant who might otherwise be amenable to settlement in the initial action might well elect to seek vindication in that action, in which plaintiff would carry the burden of proving negligence, rather than in a subsequent indemnity action in which, under defendants' contention, he would carry that burden. Settlements would be discouraged and a multiplicity of actions fostered.

■■ In the case at bar it is manifest that plaintiff's insured was confronted with a reasonable anticipation of liability. The pleadings filed on behalf of the decedents' estates alleged facts and a variety of negligent acts and omissions by Pillsbury which could have supported a substantial judgment.[2] Although we do not believe that it would be fatal to plaintiff's action if those complaints had alleged only "active" negligence (*Miller v. DeWitt*, 37 Ill.2d 273, 290-291, 226 N.E.2d 630; *Blaszak v. Union Tank Car Co.*, 37 Ill.App.2d 12, 184 N.E.2d 808; *cf. D'Amico v. Moriarty Meat Co.*, 47 Ill.App.2d 63, 197 N.E.2d 445; *Halligan v. Shulman*, 31 Ill.App.2d 168; 175 N.E.2d 590), we note that Pillsbury was charged with failure to properly maintain and equip its vehicle, omissions which might constitute only "passive" negligence. (*Shell Oil Co. v. Hercules Construction Co.*, 74 Ill.App.2d 166, 219 N.E.2d 392; *Savage v. Blancett*, 47 Ill.App.2d 355, 198 N.E.2d 120.) The parties stipulated to damages in the amount of $39,000, thus relieving plaintiff of its obligation to prove the settlement amounts. Therefore, the only element remaining to be proved was that defendant was jointly responsible for the injuries in a manner warranting recovery under any one of the numerous theories of indemnity recognized by Illinois case law. See Feirich, "Third-Party Practice," 1967 U. Ill. L.F. 236.

Apart from the contentions discussed above, defendants have not disputed that plaintiff would be entitled to indemnification if it were established that the 1962 collision was occasioned by a blowout caused by a tire defect attributable to Michelin. This concession is well warranted. (*Suvada v. White Motor Co.*, 32 Ill.2d 612, 210 N.E.2d 182; *Chicago & Illinois Midland Ry. v. Evans Construction Co.*, 32 Ill.2d 600, 208 N.E.2d 573; *Texaco, Inc. v. McGrew Lumber Co.*, 117 Ill.App.2d 351, 254 N.E.2d 584; *Shell Oil Co. v. Hercules Construction Co.*, supra: Restatement of Restitution § 95.) Accordingly, we will proceed to the issue of the sufficiency of the evidence.

■■ Defendants contend that the evidence required a finding in their favor, or, in the alternative, that the finding in favor of plaintiff was

---

[2] Plaintiff failed to introduce the complaints into evidence, but we have chosen to take judicial notice of their contents. See *State Farm Mutual Automobile Ins. Co. v. Grebner*, 132 Ill.App.2d 234, 269 N.E.2d 337.

contrary to the manifest weight of the evidence. This case was litigated upon a theory of strict liability in tort for the manufacture and sale of a defective product. It is by now well established in Illinois that strict products liability will be imposed only if the following three elements are established: (1) the injury or damage resulted from a condition of the product; (2) the condition was an unreasonably dangerous one; (3) the condition existed at the time it left the manufacturer's control. (*Suvada v. White Motor Company, supra; Dunham v. Vaughan & Bushnell Manufacturing Co.,* 42 Ill.2d 339, 247 N.E.2d 401.) There is no dispute that the injuries in the case at bar were occasioned by a blowout in a tire manufactured by one defendant and sold by the other. The basic point of contention at trial was whether the blowout was caused by a penetration of the tire by an external object lying on the road or was caused by an unreasonably dangerous condition existing in the tire when it left the manufacturer's control. We will therefore confine our discussion to a review and analysis of only that testimony and those exhibits bearing directly upon this single determinative issue.

. Plaintiff's case consisted primarily of the testimony of John Reffner, an expert in the field of chemical analysis. He testified as follows: He was the assistant director of the Institute of Material Science at the University of Connecticut, with responsibilities divided between research in microscopical analysis and administration. In 1956 he received a degree in chemistry from the University of Akron, where he had taken some courses in rubber chemistry and technology. He was employed for two and one-half years by B. F. Goodrich Company, working in their physical testing laboratory with products other than tires, and in the microscopic laboratory with the entire line of products, including tires. In the course of his employment with B. F. Goodrich he had occasion to cut up slightly less than twenty Michelin tires for the purpose of microscopic analysis. Between his years at B. F. Goodrich and his arrival at the University of Connecticut he studied chemical microscopy at the University of Colorado, was employed by a research consulting laboratory and received a masters degree from the Illinois Institute of Technology. At the request of plaintiff's attorney, Mr. Reffner had conducted a visual and microscopic examination of the left front tire of the Pillsbury truck to determine the cause of its failure. His examination revealed an 18″ rupture in the tread and underlying plies of the tire, in addition to other smaller cuts and abrasions. The rupture bore no signs of scuffing, whereas the other cuts showed external damage. He found signs of smoothing and polishing on the internal surfaces of the rupture; the rubber components were separated from the radial ply wires; and the

wires themselves were separated in a "necking down" fashion, characteristic of a break due to tension. On the basis of this examination Mr. Reffner concluded that the rubber surrounding the wires had failed mechanically, causing an internal "ply separation," which expanded outward over a period of time and resulted eventually in a gross failure of the tire in the area of the 18" rupture. This conclusion was further supported by the presence of other "ply separations" and blisters in the interior portions of the tire. Mr. Reffner said that the "ply separations" resulted from defects or errors in the manufacturing process and that, in his opinion, "there was something defective in the manufacture of the tire." This portion of his testimony was in conflict with earlier testimony that he found no defect in the manufacture of the tire; that the cause of the internal rupture was "very difficult to establish"; and that he "wouldn't be able to say for sure that it was the manufacturing problem."

On cross-examination Mr. Reffner admitted that radial ply wires might reflect tension breaks even after a blowout caused by external penetration. He also acknowledged that there were cuts and other signs of external force at the base of the 18" rupture on the tread of the tire, and that the exterior appearance of the tire was compatible with the possibility of external penetration. However, he discounted that possibility because of the exclusive "necking down" configuration of the severed wires, which indicated a tension break rather than a traumatic break. He reiterated his opinion that the blowout resulted from an internal defect.

Plaintiff introduced a number of exhibits into evidence. The Michelin tire was introduced in several pieces, one consisting of approximately 75% of the tire and the others consisting of cut-outs and cross-sections from the area of rupture. A series of photographs and photomicrographs of various portions of the tire were also introduced, but the record does not reflect the introduction by plaintiff of any photomicrographs of the severed radial ply wires.

Defendants relied primarily on the testimony of two expert witnesses. Mr. Robert G. Dunlop testified as follows: Since 1955 he had been president of Smithers Laboratories, an independent laboratory specializing in the testing of materials used in rubber compounds and in the testing of rubber products, including tires. Prior to assuming that position, he had spent 11 years with B. F. Goodrich Company engaged in all phases of tire manufacturing and testing. He had examined thousands of tires, some prior to distribution and some upon their return after field failures. Much of his testing experience involved intentionally induced tire failures with follow-up analyses and recommendations for improvements. He

performed similar tests for two years with the General Tire and Rubber Company. Immediately prior to joining the Smithers Laboratories, Mr. Dunlop was self-employed as a consultant specializing in tire manufacturing and development problems. At the request of the attorneys for Smith Tire Company, he had conducted a visual, photographic and microscopic examination of the left front tire of the Pillsbury truck. His examination revealed that the tire had suffered a blowout in the vicinity of the same 18″ rupture identified by plaintiff's expert witness. There was evidence that "a moderately sharp solid instrument * * * impacted the tire, cutting and breaking the surface of the tread." There were scratches and gouges leading from the first two ribs of the tread to the base of the rupture near the sidewall of the tire. The instrument apparently penetrated at this point and continued to rip circumferentially in the direction of rotation, breaking radial ply wires in the process. Photomicrographs were taken of the severed wires along the course of the rupture. Mr. Dunlop explained that the ends of a broken wire have a characteristic appearance depending on how the wire is broken. A wire which is broken as a result of tension has a "cup and cone" configuration and is thinner or "necked down" at the point of separation. A wire that is sheared has a sliced appearance. These contrasting configurations were illustrated by the use of diagrams and modeling clay. The photomicrographs of the rupture area revealed the presence of both configurations, indicating to Mr. Dunlop that some of the radial ply wires had been broken by a process of shearing and some by tension. The combination of surface markings and the wire configurations led him to conclude that the tire was initially penetrated by a foreign object, which sheared the radial ply wires in its path and caused a blowout, which, in turn, caused tension breaks in the remaining wires in the area of penetration. His findings were inconsistent with the possibility that an internal "ply separation" was the causative force. In addition to the presence of the surface cuts and gouges and the sheared wires, the internal surfaces of the alleged "ply separation" did not bear such characteristic traits as smoothing and polishing. There was no void to suggest the past existence of rubbing between two split surfaces; in fact, when the surfaces were realigned, they meshed almost perfectly. Thus, there was no basis for concluding that the 18″ rupture was of internal rather than external origin. A similar opinion was rendered concerning the other alleged "ply separations" and blisters; they resulted from the tire "running flat" immediately subsequent to the blowout.

On cross-examination Mr. Dunlop admitted that portions of his written report identified the presence of only tension breaks in the radial

ply wires and did not refer to shearing. He also agreed that, if an internal "ply separation" had been present, it would have reflected a flawed bonding procedure during the manufacturing process.

Mr. Sidney Bloor testified on behalf of the defendants as follows: He had been employed by Michelin Tire Company for 18 years and presently served as general manager for the North American market. In his career with Michelin he had examined and analyzed between 30,000 and 45,000 Michelin tires. He stated that there exist three categories of "ply separations." The first is an internal separation of rubber components over a considerable length of time. It is manifested by a phenomenon known as "crumbling of the rubber," in which the rubbing together of the detached surfaces produces a fine rubber powder and a void in the area of separation. The second type of "ply separation" is similar to the first, but occurs over a shorter period of time, and is identified by a tackiness in the rubber and a strong lingering odor. The third type is a splitting or detachment and is caused by an external shearing force. Mr. Bloor was asked to examine cross sections of the 18″ rupture from the Michelin tire and to express an opinion as to the category of separation present. He concluded that it was of the third type, a splitting by a shear force. There existed no voids, rubber powder or tackiness. The lines of shear were clearly visible and, when they were aligned, it created a "beautiful fit." There also existed surface gouges and scratches leading to the point of rupture. In his opinion, the cause of the rupture was penetration by a blunt foreign object.

On cross-examination and in response to the trial judge's inquiries Mr. Bloor stated that he had examined thousands of Michelin tires which had been returned as defective. He asserted that he did not discover a single manufacturing defect in any of those tires. This assertion was supported by the subsequent testimony of Michelin's vice-president.

Defendants also introduced into evidence photographs and photomicrographs. Included among these were photomicrographs of the ends of the severed radial ply wires, with the contrasting configurations highlighted.

Defendants contend that the trial court should have found in their favor at the close of all the evidence. They contend that neither the proof of a blowout nor the testimony of plaintiff's expert witness established prima facie the presence of a manufacturing defect in the Michelin tire. Alternatively, it is contended that, assuming arguendo that plaintiff's evidence established a prima facie case, defendants' contrary evidence so preponderated that all the evidence, even when viewed in its aspects most favorable to plaintiff, so overwhelmingly favored defen-

dants that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R.*, 37 Ill.2d 494, 229 N.E.2d 504.

■■ We have accepted as undisputed that the immediate cause of the 1962 collision was a blowout in the Michelin tire on the Pillsbury truck. However, proof of the occurrence of a tire blowout carries no implication of product defectiveness. The term "blowout" is merely descriptive of a sudden, forceful expulsion of air, usually from a pneumatic tire. It in no way suggests the cause for the expulsion, nor whether that cause is of internal rather than external origin. See *Shramek v. General Motors Corp.*, 69 Ill.App.2d 72, 216 N.E.2d 244; *Williams v. U.S. Royal Tires* (La.App.), 101 So.2d 488.

In order to establish a prima facie case, plaintiff was obligated to prove by additional evidence that the blowout was caused by a defect in the Michelin tire which existed at the time the tire left the manufacturer's control. (*Suvada v. White Motor Co., supra.*) To this end, plaintiff presented an expert witness, Mr. John Reffner, who expressed the opinion that the Michelin tire ruptured as a direct consequence of an internal "ply separation," resulting from a defect in the manufacturing process. This opinion was based on the following facts: (1) the area of rupture bore no evidence of scuffing or other external damage; (2) the radial ply wires had been split in a "necking down" fashion, characteristic of a break due to tension rather than to shearing; (3) the internal surfaces of the rupture showed signs of smoothing and polishing; (4) other "ply separations" and blisters were found inside the tire. On cross-examination, however, Mr. Reffner abandoned his first supportive finding and qualified his second. He acknowledged the presence of cuts and gouges at the base of the 18″ rupture, and admitted that an externally induced blowout might also result in a tension breakage of radial ply wires. He also agreed that the exterior appearance of the tire was compatible with the possibility of external penetration. Nonetheless, he held to the opinion that this blowout was of internal origin and, in support, cited the total absence of externally sheared wires in the area of rupture.

■■■ On the basis of Mr. Reffner's testimony and his apparent expertise in the field of microscopic analysis; we conclude that plaintiff established a prima facie case in strict products liability. We recognize that the term "ply separation" was never precisely defined; it is unclear whether it constitutes a disengagement of layers of bonded rubber plies, a decomposition of rubber components, or something else.[3] However,

---

[3] This confusion was compounded by defendants' expert testimony that the tire in question was a single ply tire.

this lack of clarity bears less on the sufficiency of the evidence than on its weight and on the credibility of the witness. We also recognize that the expert witness did not identify the specific defect causing the "ply separation," but merely opined that the separation reflected an error in the manufacturing process. This opinion, in conjunction with other testimony and physical exhibits, was sufficient. A manufacturing defect may be proven by either direct or circumstantial evidence. (*Bollmeier v. Ford Motor Co.*, 130 Ill.App.2d 844, 265 N.E.2d 212; *Nolan v. Shaf Manufacturing Co.*, 128 Ill.App.2d 19, 261 N.E.2d 209; *Gibbs v. Proctor & Gamble Manufacturing Co.*, 51 Ill.App.2d 469, 201 N.E.2d 473.) Our review of the abundant products liability case law reveals an almost exclusive reliance on circumstantial evidence for the proof of defects. This has engendered a proliferation of law review commentary categorizing and analyzing the varieties of circumstantial evidence prevalent in products liability cases. (Rheingold, "Proof of Defect in Product Liability Cases," 38 Tenn. L. Rev. 325; Note, "Proof of Defect in a Strict Products Liability Case," 22 Maine L. Rev. 189; Note, "Products Liability and the Problem of Proof," 21 Stan. L. Rev. 1777.) It would unduly lengthen our opinion to fully critique those articles. We need only note two categories of circumstantial evidence which are recognized in most of these articles: (1) expert opinion that the product was defective; (2) evidence negating alternative causes. Both of these categories were represented in the testimony of plaintiff's expert in the case at bar. To require identification of the precise defective procedure or mechanism which created the "ply separation" would be to place an intolerable burden upon this plaintiff. In every products liability case there must exist some juncture beyond which a plaintiff need not and perhaps cannot be more specific. It is sufficient if, by expert opinion and/or circumstantial evidence, it appears more probable than not that the product in question contained a defect when it left the manufacturer's control, and that the defect was causally connected to the injury. In some cases the requisite quantum of proof may correspond to that usually required to invoke the doctrine of *res ipsa loquitur*, although purists would correctly note that *res ipsa loquitur* is incompatible with a strict liability theory. (Prosser, "The Fall of the Citadel," 50 Minn. L. Rev. 791, 842; Rheingold, "Proof of Defect in Product Liability Cases," 38 Tenn. L. Rev. 325; C. McCormick, Law of Evidence 643 (1954 ed.).) Yet, the doctrine of *res ipsa loquitur* is no more than a recognition that the proof of certain facts may logically lead one to the inference or presumption of the negligence of one or more parties. (I.L.P. Negligence § 202.) The underlying principle that circumstantial evidence may create inferences of fact which are not otherwise subject to direct proof is entirely con-

sonant with a strict liability theory. This is illustrated by the recent case of *Bollmeier v. Ford Motor Co., supra,* wherein the reviewing court enunciated the following rule:

> "[D]irect or circumstantial evidence which tends to prove that the product failed to perform in the manner reasonably to be expected in the light of its nature and intended function, such as proof of a malfunction which tends to exclude other extrinsic causes, is sufficient to make a prima facie case on this issue." 130 Ill.App.2d 844, 851.

In *Bollmeier* the plaintiff had been involved in a one-car accident, allegedly as a result of a failure in the steering system. He introduced testimony that there existed in his car a malfunction which was manifested by a vibration in the steering; that such vibration could cause a metal failure or loosening of bolts in the steering mechanism; and that the car failed to respond when plaintiff attempted to turn a corner. The court held that this evidence was sufficient to present a jury question on the issue of the defectiveness of the automobile.

In the case at bar plaintiff has relied on expert testimony and physical exhibits. Although Mr. Reffner's experience in the field of tire analysis was limited, and his presentation was admittedly conflicting in some parts and weak in others, when that testimony is viewed in its aspects most favorably to plaintiff, we believe that it suffices to establish a prima facie case.

Our conclusion that plaintiff's evidence established a prima facie case does not dispose of defendants' contention that the trial court should have found in their favor at the *close* of all the evidence. This contention requires an analysis of all the evidence in the context of the standard enunciated by *Pedrick v. Peoria & Eastern R.R., supra.*

We have already alluded to certain weaknesses and contradictions in the testimony of plaintiff's expert witness. These assume greater proportion when contrasted with the expert testimony and physical exhibits introduced by defendants. Defendants' first expert witness, Mr. Dunlop, was president of an independent laboratory specializing in the testing and analysis of rubber products. His expertise in the diagnosis and analysis of tire failures was unimpeachable. His testimony totally undermined the factual basis upon which plaintiff's expert had concluded that the tire rupture was of internal origin. He located cuts and gouges on the tread of the Michelin tire and traced them to the base of the 18" rupture. Photomicrographs of the ends of the severed radial ply wires were introduced into evidence to illustrate the presence of sheared wires in addition to wires broken by tension. He referred to cross sections of the rupture to show the absence of voids, polishing or smooth-

ing. The presence of other "ply separations" and blisters were explained as the natural consequence of "running flat" immediately after a blowout. Mr. Dunlop expressed, and painstakingly supported, the opinion that the blowout in the Michelin tire was caused by penetration by an external object. His testimony was clear, unequivocal, unimpeached, and in harmony with the physical exhibits introduced by plaintiff and defendants. The testimony of defendants' second expert witness, also an unquestioned authority in the field of tire failures, corroborated Mr. Dunlop's and was equally compelling and impeaching of plaintiff's expert, although its weight was somewhat diminished by his long association with the Michelin Tire Company.

■■■■ Plaintiff presented the testimony of one expert witness; defendant presented the testimony of two. Although the number of witnesses for each side is a factor to be considered, it is not determinative. (*Miller v. Green,* 345 Ill.App. 255, 103 N.E.2d 188.) The conflicting testimony of expert witnesses normally raises an issue uniquely determinable by the trier of fact, who is in a better position to view the pertinent exhibits and assess the credibility of the witnesses. However, the weight of an expert's opinion must be measured by the reasons given for the conclusion and the factual details marshalled in support thereof. (*People v. Burress,* 1 Ill.App.3d 17, 272 N.E.2d 390.) The opinion of an expert is of value only when it is based upon and in harmony with facts which are capable of verification by the court (*Yowell v. Hunter,* 403 Ill. 202, 214, 85 N.E.2d 674), and, where a factual basis is lacking, the opinion is entitled to little weight. (*Manion v. Brant Oil Co.,* 85 Ill.App.2d 129, 136, 229 N.E.2d 171.) In the case at bar the opinion of plaintiff's expert was directly contradicted by the defendants' experts, but, of greater importance, it was severely impeached by the physical exhibits introduced into evidence. When exhibits are a significant part of the record, the reviewing court is in as good a position to decide the case as is the trial court. (*Yowell v. Hunter, supra.*) We have closely examined the exhibits in this case in conjunction with the related illustrative testimony of all the experts. We conclude that the tire, the cross sections of the rupture, the photographs, and particularly the photomicrographs of the radial ply wires all support defendants' theory of the case.

■■■■ Defendants, too, may develop their theories through circumstantial evidence; it would impose an equally unwarranted burden on defendants in this case to require production of *the* instrument which punctured the exterior of the Michelin tire. It is sufficient for defendants if, by expert opinion and/or circumstantial evidence, it appears more probable than not that the product in question did not contain a defect when it left the manufacturer's control, or that the injury was caused

by some other independent force. We believe that defendants' evidence met and surpassed this standard, and satisfied the criteria expressed in *Pedrick v. Peoria & Eastern R.R. Co., supra.* Judgment in favor of defendants should have been entered at the close of all the evidence. We reverse.

Judgment reversed.

LEIGHTON and HAYES, JJ., concur.