**NATIONAL TEA CO., Plaintiff,**

v.

**RYAN AVIATION CORPORATION, Defendant and Third Party Plaintiff,**

v.

**DISTRIBUTION LEASING CORPORATION, Third Party Defendant.**

No. 82 C 7748.

United States District Court, N.D. Illinois, E.D.

Jan. 18, 1984.

William E. McNulty, Hogan, McNulty & Meyer, P.C., Chicago, Ill., for defendant and third party plaintiff.

Michael H. Saken, Wheeling, Ill., for third party defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

National Tea Company ("National") originally sued Ryan Aviation Corporation ("Ryan") for its alleged failure to surrender a leased warehouse in good repair at the conclusion of Ryan's lease. After Ryan settled that claim for $85,000, it filed an Amended Third-Party Complaint against Distribution Leasing Corporation ("Distribution") for indemnification of that amount plus prejudgment interest, costs and attorneys' fees.

Ryan now moves for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Ryan's motion is granted in principal part.

### Facts [1]

On January 23, 1974 National (the then-current lessee of a warehouse located at 3636 South California Avenue in Chicago)

1. This section sets the stage for the ensuing discussion of Ryan's legal claim. Other more detailed facts will be related as relevant in the course of that discussion.

2. Traylek is not a party to this action.

3. As part of its Rule 56 submission, Ryan has furnished inspection reports dated September 10, 1982 and April 1983 on the estimated damages to the warehouse.

4. That paragraph reads:
   2. Lessee has examined and knows the condition of the Premises and has received the same in good order and repair, and acknowledges that no representations as to the condition and repair thereof have been made by Lessor, or his agent, prior to or at the execution of this lease that are not herein expressed; Lessee will keep the Premises including all appurtenances, in good repair, replacing all broken glass with glass of the same size and quality as that broken, and will replace all damaged plumbing fixtures with others of equal quality, and will keep the Premises, including adjoining alleys, in a clean and healthful condition according to the applicable municipal ordinances and the direction of the proper public officers during the term of

sublet those premises to Traylek Warehouse, Inc. ("Traylek").[2] On March 1, 1978 Traylek assigned its sublease (the "Lease") to Ryan with National's consent. Then on November 1, 1978 Ryan and Distribution entered into an agreement (the "Assignment"), again with National's consent, assigning the Lease to Distribution.

On April 30, 1982 Distribution returned the premises to National in a state of disrepair.[3] Ryan contends Distribution is liable under the Assignment for the entire amount of Ryan's own settled liability to National (National had opted, as was its right under the Lease, to sue only Ryan). Distribution responds that (a) material questions of fact exist as to the damage caused by its own occupancy and (b) Ryan's settlement with National was not in good faith or reasonable.

### Scope of Distribution's Obligations

Distribution's obligation to indemnify Ryan arises out of its assumption of the Lease, Paragraph 2 [4] of which provides the lessee has the obligation to keep the premises in good repair. Lease ¶ 5 [5] obligates

this lease at Lessee's expense, and will without injury to the roof, remove all snow and ice from the same when necessary, and will remove the snow and ice from the sidewalk abutting the Premises; and upon the termination of this lease, in any way, will yield up the Premises to Lessor, in good condition and repair, loss by fire and ordinary wear excepted, and will deliver the keys therefor at the place of payment of said rent.

5. That paragraph provides:
   5. Lessee covenants and agrees that he will protect and save and keep the Lessor forever harmless and indemnified against and from any penalty or damages or charges imposed for any violation of any laws or ordinances, whether occasioned by the neglect of Lessee or those holding under Lessee, and that Lessee will at all times protect, indemnify and save and keep harmless the Lessor against and from any and all loss, cost, damage or expense, arising out of or from any accident or other occurrence on or about the Premises, causing injury to any person or property whomsoever or whatsoever and will protect, indemnify and save and keep harmless the Lessor against and from any and all claims and against and from any and all loss, cost, damage or expense arising out of any failure

the lessee, in the event of its noncompliance with Lease ¶ 2, to indemnify the lessor for any loss occasioned by such failure.

There is no question the warehouse was in disrepair at the conclusion of Distribution's occupancy. What the parties do dispute is what part of that damage Distribution agreed to be liable for as between itself and Ryan. That question calls for construction of the Assignment, following the same rules applicable to interpretation of any other contract. 21 I.L.P. Indemnity § 12, at 458–59.

Five Assignment provisions have potential relevance to this dispute. By Assignment ¶¶ 4 and 5 [6] Distribution agreed to assume and to perform all the Lease covenants as of November 1, 1978 (with a limited exception as to the rent commencement date). By Assignment ¶¶ 3 and 6 [7] Ryan warranted it would not be in default under any of the Lease covenants as of the same date and agreed to be responsible for performance until that date (again with the same exception). Finally Ryan and Distribution agreed in Assignment ¶ 10:

> 10. Assignee acknowledges that it has conducted its own independent inspection and examination of the Premises and is not relying upon any claims or representations, whether written or not, of the Assignor or any of its agents in regard to the Premises, it being understood and agreed that the Lease is being assigned

to Assignee on an "as is" and "where is" basis except as provided for in this Assignment and provided further that the Assignor agrees to provide the Assignee with the amount of $6,900.00 to be used primarily by the Assignee in the repair of the electrical system, roof, tuckpointing and overhead doors of the premises and related matters incident thereto. The only responsibility the Assignor shall have for the heating system is to repair or replace either of the two most westerly oil fired heating units located in the building.

Distribution's acceptance of the premises "as is," coupled with its Assignment ¶¶ 4 and 5 agreements of Lease assumption and performance after November 1, 1978, unequivocally make it liable (as between it and Ryan) for *all* repairs—whether occasioned before or after it took over the building. At worst it might be argued an ambiguity is created by the Assignment ¶ 3 Ryan warranty of no Lease defaults as of the November 1 date, and perhaps the Assignment ¶ 6 "remain responsible ... up to November 1" provision, both read in conjunction with Assignment ¶ 10's statement that the "as is" provision is "except as provided for in this Assignment."

■ Where a contract is ambiguous a court can of course resort to parol and

---

**6.** *Those paragraphs read:*

4. Assignee hereby covenants and agrees to assume the Lease and to become bound under all of the terms, conditions and provisions contained therein and will perform and observe all of the covenants and conditions therein contained from and after November 1, 1978.

5. Assignor agrees that it shall pay the monthly rent of $6,787.50 required by the Lease through December 31, 1978. The Assignee agrees that it shall commence the payment of the monthly rent of $7,916.66 required by the terms and conditions of the Lease commencing January 1, 1979 through April 30, 1982. Notwithstanding the aforementioned, the Assignee hereby agrees and assumes to be bound by all of the other terms

and conditions of said Lease as of November 1, 1978, including, but not limited to the payment of taxes, insurance, utilities, repairs, maintenance and other matters contained within the Lease.

**7.** *Those paragraphs provided:*

3. Assignor further covenants and warrants that it is not in default under any of the provisions or conditions of said Lease as of the date hereof and will not be in default with any of the terms or conditions of said Lease as of November 1, 1978.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

6. Assignor shall remain responsible for the performance and observance of all of the covenants and conditions in the Lease up to November 1, 1978, save and except the Assignor shall continue to be responsible for the payment of the base rent through and including the months of November and December of 1978 as provided for in paragraph 5 hereof.

other extrinsic evidence in resolving the ambiguity. 12A I.L.P. Contracts § 262, at 102–03. Neither party has submitted any evidence to that end: Ryan simply relies on the "as is" language (R.Mem. 2), while Distribution merely tenders an affidavit indicating some few items of disrepair existed when it took over—but that latter fact of course in no way vitiates the force of the "as is" undertaking (indeed it serves to explain why such a provision was necessary and was included).

■ Under the general rule of contract construction that the more specific clause controls over the more general (12A I.L.P. Contracts § 247, at 87), it is plain the parties in fact agreed Ryan's liability for repair would be eliminated except for the specific items mentioned in Assignment ¶ 10.[8] Given that normal rule of construction, together with the fact neither party has tendered any evidentiary materials to change the rule or make it inapplicable, this

Court determines Assignment ¶ 10 should be given its literal and normal meaning.[9] Distribution in fact committed itself to Ryan to assume responsibility for all needed repair items, except as specifically provided in Assignment ¶ 10.[10]

That determination moves the inquiry to its second level: whether Distribution is liable for the full amount of Ryan's settlement with National, as long as that settlement was made in reasonable anticipation of personal liability and the settled amount was reasonable. That is indeed the teaching of such Illinois cases as *St. Paul Fire and Marine Insurance Co. v. Michelin Tire Corp.*, 12 Ill.App.3d 165, 169, 298 N.E.2d 289, 292–93 (1st Dist.1973) and *LeMaster v. Amsted Industries, Inc.*, 110 Ill. App.3d 729, 732, 66 Ill.Dec. 454, 457, 442 N.E.2d 1367, 1370 (5th Dist.1982). Under those cases notice of settlement to the prospective indemnitor is *not* required if the earlier-stated standards are met.

**8.** It will not do to read the "except as provided for in this Assignment" language, in tandem with Assignment ¶¶ 3 and 6, as reimposing the responsibility for the November 1 conditions on Ryan. That would render the whole "as is" concept meaningless, permitting the exception to swallow up the rule itself. Such an impermissibly expansive construction would have obviated the need for a cash allowance and for the last sentence of Assignment ¶ 10 itself. Indeed it is a fair reading that the last sentence—stating a limited heating system repair or replacement burden on Ryan—is itself the "except as provided for" limitation on the "as is" language earlier in the same paragraph.

**9.** In addition to the plain meaning of Assignment ¶ 10 and the rule of construction stated and applied in the text, there is added evidence in the total documentation that Distribution seeks to have Assignment ¶¶ 3 and 6 carry too much baggage. As already noted, Assignment ¶ 3 speaks of the absence of "default" under the Lease as of November 1, 1978. It should be pointed out that when National was asked to consent to the Assignment, its letter granting such consent (in accordance with the typical request made under such circumstances) added (National Complaint Ex. F, emphasis added):

The undersigned affirms that the aforesaid sublease is in full force and effect, the monthly rents have been paid through November 30, 1978, and that *Lessee is not in default thereunder.*

Obviously National was using "default" in its common meaning in lease transactions: nonperformance of lease covenants after notice. It was not issuing a blank check covering (for example) the condition of the premises or any other non-performance of lease covenants (other than payment of rent) that might exist but were not already the subject of dispute. It is surely reasonable to read Assignment ¶ 3, which employs the "default" locution, in precisely the same way. So read, there is no ambiguity that needs to be resolved in the first place. As for Assignment ¶ 6, it speaks of Ryan continuing to "remain responsible for the performance and observation of all of the covenants and conditions in the Lease up to November 1, 1978...." As part of an assignment agreement executed that very same November 1 date, that language can scarcely be read as obligating Ryan to make or bear the responsibility for repairs already required as of the time of execution—especially in the face of the specific provisions of Assignment ¶ 10.

**10.** On this motion for summary judgment, once Ryan submitted the Assignment, the meaning of which Distribution knew was *the* critical element in the case, Distribution could not hold back any evidence it had regarding such meaning. *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983). On the subject of "holding back" on summary judgment motions generally, see *Refrigeration Sales Co. v. Mitchell-Jackson, Inc.*, No. 81 C 5581, slip op. at 5–6 (N.D.Ill. Dec. 16, 1983) and cases cited.

Distribution has cited not a single contrary authority to this Court. Indeed Distribution's scant (three-page) memorandum in opposition does not even address the issue, instead challenging only the reasonableness and bona fides of the Ryan-National settlement. Though the idea of such liability without notice is troublesome to this Court, in this diversity action it is bound to follow established Illinois law absent some constitutional flaw.[11]

This Court turns then to application of the *St. Paul* criteria. Each of them is satisfied here.

First, it is clear Ryan reasonably anticipated its own personal liability for the damages to the warehouse. National's November 22, 1978 letter consenting to the Assignment (National's Complaint Ex. F) had specifically preserved Ryan's full liability under the Lease:

> The aforesaid consent is given on condition that it should not be construed to release, alter or modify in any way the obligations of Ryan Aviation Corporation or Traylek Warehouse, Inc. under the terms and conditions of the aforesaid sublease.

There was no novation; Ryan remained liable to National for compliance with the Lease's covenant of good repair.[12]

Second, the $85,000 settlement amount is clearly reasonable in light of the great disparity between the two experts' evaluations of the disrepair. National's consultant fixed the aggregate warehouse damage (including the need to replace the entire roof at a cost of some $234,000) at $464,244.76. Ryan's expert placed the damage figure at $62,168.11 (he excluded any amount for roof repair on the ground normal maintenance would not restore it to a state of good repair, Dearlove Aff. ¶ 10). Under those circumstances the $85,000 settlement was larger than the proverbial breadbox and smaller than the proverbial elephant (even a reduced elephant of $230,000, discounting roof repair entirely), and it was much closer to the breadbox size. There is no way in which $85,000 can reasonably be viewed as an unreasonable settlement.[13]

Accordingly this Court holds Ryan has established Distribution's liability for the full $85,000 settlement amount. All that remains is to address Ryan's contentions it is entitled to prejudgment interest from the date of filing its Amended Third Party Complaint and to its reasonable attorneys' fees and costs of the suit. Except for the attorneys' fees claim, Ryan is right again.

■ Prejudgment interest in this diversity action is available only if provided by the

---

**11.** Of course application of a judicial doctrine can constitute state action, *Shelley v. Kraemer,* 334 U.S. 1, 14–18, 68 S.Ct. 836, 843–844, 92 L.Ed. 1161 (1948). And that notion extends to judicial deprivation of substantive rights "without providing adequate notice and opportunity to defend," *id.* at 16, 68 S.Ct. at 843. None of the Illinois cases discusses any due process implications of the indemnitor's liability without *prior* notice of the settlement, or whether the later opportunity to challenge bona fides is enough in due process terms (in that respect it may be observed a notified indemnitor could throw a monkey wrench into bona fide settlement negotiations, leaving the indemnitee in an untenable position).

**12.** *St. Paul* and kindred cases require only a showing of the prospective indemnitee's liability to the original plaintiff, even though that liability might certainly be laid off against the indemnitor. It may be that the chance a court may not enforce the right of indemnification, or the possibility the indemnitor may not be good for

it, or like or unlike risks may assure that the indemnitee has the incentive to bargain in good faith with the original plaintiff. This Court need not face the situation that could be posed by (say) an iron-clad indemnification agreement from (say) IBM, so that the prospective indemnitee would be wholly without risk and therefore willing to pay whatever the original plaintiff might ask. And in any case, the second *St. Paul* element—reasonableness of the settlement—requires a showing of bona fides, so that the indemnitor would be protected against such an arbitrary or collusive surrender to the original plaintiff.

**13.** Distribution has tendered only the affidavit of its President Fred Peckler, which *disputes* Dearlove's estimates in some comparatively minor particulars. Even giving Distribution the most favorable assumption (that is, even crediting Peckler's less-than-precise claims), no genuine issue of material fact is posed as to the reasonableness of settling such a large claim as National's at the $85,000 level.

parties' agreement or permitted by statute. *Steward v. Yoder*, 86 Ill.App.3d 223, 225, 41 Ill.Dec. 709, 711, 408 N.E.2d 55, 57 (4th Dist.1980). Because the Assignment itself contained no provision for prejudgment interest, Ryan is relegated to Ill.Rev.Stat. ch. 17, § 6402:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance[;] on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

For purposes of that statute a lease is an "other instrument of writing." *Montgomery Ward & Co. v. Wetzel*, 98 Ill.App.3d 243, 250, 53 Ill.Dec. 366, 372, 423 N.E.2d 1170, 1176 (1st Dist.1981). Plainly the Assignment satisfies that description as well. And at least as of the date Ryan filed its Amended Third Party Complaint, the amount due under the Assignment was liquidated and subject to exact computation. *See Farwell Construction Co. v. Ticktin*, 84 Ill.App.3d 791, 809, 39 Ill.Dec. 916, 929–930, 405 N.E.2d 1051, 1064–65 (1st Dist. 1980). Nor does it alter the result that Distribution's unsuccessful defense was asserted in good faith. *Montgomery Ward*, 98 Ill.App.3d at 250, 53 Ill.Dec. at 372, 423 N.E.2d at 1176. Accordingly Ryan is entitled to 5% interest on $85,000 from September 1, 1983 to the date of judgment.

As for attorneys' fees,[14] in accordance with the "American Rule" they are recoverable only if the Assignment so provides. 21 I.L.P. Indemnity § 16, at 470–71. It does not. True enough Ryan (or for that matter Distribution) might have been liable to National for *National*'s fees under Lease ¶ 16:

> 16. Lessee will pay and discharge all reasonable costs, attorney's fees and expenses that may be incurred by Lessor, in enforcing the covenants and agreements of this lease, and this lease and all covenants and agreements herein contained shall be binding upon, apply, and inure to their respective heirs, executors, successors, administrators, and assigns of all parties to this lease.

Had such liability been imposed on Ryan, it could have sought indemnification from Distribution in the same way it has been held entitled to recover its $85,000. But nothing in those facts changes the rule insulating Distribution from bearing *Ryan's* attorneys' fees.

### Conclusion

There is no genuine issue of material fact, and Ryan is entitled as a matter of law to a judgment against Distribution in the principal amount of $85,000, plus interest at the rate of 5% per annum from September 1, 1983 to the date of judgment. Ryan's request for its attorneys' fees is denied. Costs are allowed to Ryan under Rule 54(d).

---

**14.** Taxable costs will be awarded Ryan under Rule 54(d).