BETHLEHEM STEEL CORPORATION,
Plaintiff–Counterdefendant, Appellee,
Cross–Appellant,

v.

CHICAGO EASTERN CORPORATION,
Defendant–Counterplaintiff, Appellant,
Cross–Appellee.

Nos. 86–3048, 86–3101.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1987.

Decided Nov. 23, 1988.

As Amended Dec. 6, 1988.

Patrick W. O'Brien, Mayer, Brown & Platt, Chicago, Ill., for defendant-counterplaintiff, appellant, cross-appellee.

Terence E. Flynn, Gessler, Wexler, Flynn, Laswell & Fleischmann, Ltd., Chicago, Ill., for plaintiff-counterdefendant, appellee, cross-appellant.

Before FLAUM and MANION, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

FLAUM, Circuit Judge.

Bethlehem Steel Corporation ("Bethlehem") filed suit against Chicago Eastern Corporation ("Chicago Eastern") to collect payment for a shipment of steel sold to Chicago Eastern. Bethlehem's amended complaint alleged that Chicago Eastern had breached the parties' contract and committed fraud. Chicago Eastern counterclaimed, arguing that a prior shipment of steel from Bethlehem had been defective and that Chicago Eastern was entitled to offset the damages resulting from the prior sale against the cost of the later shipment. The dispute was tried to a jury which rendered a verdict in favor of Bethle-

hem for breach of contract, and against Chicago Eastern on its counterclaim. Both parties appeal, each raising numerous issues. We affirm the decision reached in the district court on each issue.

## I.

Chicago Eastern is in the business of building circular grain storage tanks for its customers located throughout the United States. In May 1976, Chicago Eastern purchased corrugated sheet steel from Bethlehem ("the first purchase"). This steel was used as wall sheets in some of the tanks constructed by Chicago Eastern. The tanks subsequently developed fractures and Chicago Eastern was forced to incur substantial expenses to replace the fractured steel. Chicago Eastern attributed the fractures to defects in Bethlehem's steel and attempted to communicate the problem to Bethlehem. This proved unsuccessful. In November 1979, Chicago Eastern proceeded to order more steel from Bethlehem, but instead of sending Bethlehem a check, Chicago Eastern mailed a "debit memo" offsetting the purchase price by the amount of the alleged damages it incurred in repairing the defective grain bins for its customers ("the second purchase").

Bethlehem filed suit in federal district court seeking to collect payment for the second shipment.[1] The amended complaint alleged that Chicago Eastern had breached the parties' contract and committed fraud. Bethlehem sought both punitive and compensatory damages. Chicago Eastern counterclaimed, alleging negligence and breach of both an implied warranty of merchantability and an implied warranty of fitness for a particular purpose ("the implied warranty claims"). The dispute was tried to a jury. After Chicago Eastern had presented its evidence, the district court granted Bethlehem's motion for a directed verdict on Chicago Eastern's merchantability claim. On September 26, 1986, the jury rendered a verdict in favor of Bethlehem

for $23,749.30. The jury found against Bethlehem on its fraud claim and against Chicago Eastern on its particular purpose warranty claim.

On appeal, the parties raise five issues with respect to Chicago Eastern's counterclaim. First, Bethlehem contends that it was not necessary to reach the merits of Chicago Eastern's implied warranty claims because Chicago Eastern's counterclaim was brought after the period authorized in the applicable statute of limitations had elapsed. The district court held that these claims were timely brought under Ill.Rev. Stat. ch. 110, paragraph 13–207, which provides an exception for certain counterclaims that would otherwise be time-barred.

The next three issues all involve decisions by the district court during the course of the trial which Chicago Eastern contends were error and require a new trial. First, Chicago Eastern argues that the district court erred in granting Bethlehem's motion for a directed verdict on Chicago Eastern's claim that Bethlehem breached the implied warranty of merchantability applicable to the first purchase. Second, Chicago Eastern contends that a jury instruction relating to Chicago Eastern's claim that Bethlehem breached an implied warranty of fitness for a particular purpose was improper. Third, Chicago Eastern argues that the district court erred in admitting into evidence testimony that the damages alleged in Chicago Eastern's counterclaim resulted from defects in Chicago Eastern's designs, and not from the steel supplied by Bethlehem.

■ Finally, Chicago Eastern contends that the district court erred when it granted Bethlehem's motion to strike Chicago Eastern's tort claims. The district court held that under Illinois law Chicago Eastern was precluded from suing in tort for purely economic loss arising from a breach of contract and that Chicago Eastern had

1. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332. Bethlehem is a Delaware corporation with its principal place of business in Pennsylvania. Chicago Eastern is an Illinois corporation with its principal place of business in Illinois. The amount in controversy exceeds $10,000. The parties agree that Illinois law governs this dispute.

not alleged a claim for implied indemnification, a possible exception to the rule prohibiting tort suits for contract breaches.[2]

## II.

### A.

The threshold issue is whether Chicago Eastern's implied warranty claims were barred under the applicable statute of limitations. The first purchase by Chicago Eastern was made in May of 1976. In November of 1979, Chicago Eastern made the second purchase which it "paid for" using the debit memo. Shortly thereafter, Bethlehem filed suit to collect payment for the second purchase. Chicago Eastern counterclaimed in September 1980 claiming that the steel acquired in the first purchase was defective. Thus, Chicago Eastern brought its implied warranty claims more than four years after purchasing the steel. Bethlehem argues that this was too late. The district court disagreed.

■ Under Illinois law, an action for breach of an implied warranty must generally be commenced within four years from the date when the goods were tendered by the seller to the buyer. Ill.Rev.Stat. ch. 26, para. 2–725.[3] The district court recognized that Chicago Eastern's suit was not brought within this period but held that the counterclaim was timely under Ill.Rev.Stat. ch. 110, para. 13–207. This statute provides that:

A defendant may plead a set-off or counterclaim barred by the statute of limitation, while held and owned by him or her, to any action, the cause of which was owned by the plaintiff under whom he or she claims, before such set-off or counterclaim was so barred, and not otherwise.

The essence of this somewhat cumbersome provision is that a defendant in a lawsuit may bring a counterclaim after the period authorized in the applicable statute of limitations has elapsed, as long as the plaintiff's claim arose before the cause of action brought as a counterclaim was barred. *Kuh v. Williams,* 13 Ill.App.3d 588, 301 N.E.2d 151, 154 (1973). In this case, Bethlehem's claim arose in 1979 when Chicago Eastern paid for the second purchase with a debit memo. Under paragraph 2–725, Chicago Eastern had until May 1980 before its implied warranty claims relating to the first purchase were barred by the statute of limitations. Bethlehem's action therefore arose before the limitation period for Chicago Eastern's implied warranty claims elapsed. Accordingly, Chicago Eastern's counterclaim was filed within the time period authorized under paragraph 13–207.

Bethlehem urges us to find Chicago Eastern's claim untimely despite its apparent compliance with the language of paragraph 13–207. First, Bethlehem argues that the statute of limitations found in paragraph 2–725 is both more specific than paragraph 13–207 and was adopted by the

**2.** Bethlehem also appeals from the district court's decision not to instruct the jury on punitive and exemplary damages. In Illinois, punitive damages are only available in an action for breach of contract when the conduct is so egregious that it amounts to an independent tort. *See, e.g., Morrow v. L.A. Goldschmidt Associates, Inc.,* 126 Ill.App.3d 1089, 1093–94, 82 Ill.Dec. 152, 156, 468 N.E.2d 414, 418 (1984), *rev'd on other grounds,* 112 Ill.2d 87, 96 Ill.Dec. 939, 492 N.E.2d 181 (1986). In this case, Bethlehem asserted that Chicago Eastern's second purchase amounted to fraud, but the jury decided against Bethlehem on this claim. We reject Bethlehem's argument that the failure to give the requested instructions "infected" the verdict and hold that the district court properly instructed the jury on damages. We also reject Bethlehem's other contentions related to its fraud count raised in its cross-appeal.

**3.** Illinois Revised Statutes, chapter 26, paragraph 2–725 provides in part:

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued. By the original agreement the parties may reduce the period of limitation to not less than one year but may not extend it.

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

Illinois legislature more recently than paragraph 13–207. Bethlehem reasons that paragraph 2–725 therefore implicitly amends paragraph 13–207, rendering it inapplicable to implied warranty cases under the Illinois Commercial Code. We do not find this argument persuasive because we fail to see any conflict between paragraph 2–725 and paragraph 13–207.[4] Rather, paragraph 13–207 is a specific exception to the statute of limitations applicable to a given cause of action—in this case paragraph 2–725—that arises when a defendant in a suit brings a counterclaim. The plain language of paragraph 13–207 specifically states that the defendant in a lawsuit is permitted to bring a counterclaim that would otherwise be barred by the statute of limitations. There is no indication from the Illinois legislature that the particular statute of limitations applicable here, paragraph 2–725, was to be exempt from the exception for counterclaims authorized in paragraph 13–207.

■ Second, Bethlehem argues that Chicago Eastern's counterclaim should be barred because it relates to the first purchase in 1976, not the suit Bethlehem brought in 1980 to collect payment for the second purchase. Bethlehem correctly observes that the theory behind paragraph 13–207 is that a plaintiff who files a claim waives the protection of the statute of limitations applicable to any counterclaims the defendant might possess. *Ogg v. City of Springfield*, 121 Ill.App.3d 25, 76 Ill.Dec. 531, 537, 458 N.E.2d 1331, 1337 (1984). Bethlehem then reasons that this rationale only makes sense where the counterclaim arises from the same transaction that gave rise to the plaintiff's suit. In Bethlehem's

view, because Chicago Eastern's counterclaim did not arise from the second purchase, it should be barred.

Although we recognize that there is some force in Bethlehem's argument,[5] we must look to the plain language of the statute. As the district court observed,

> the statute permits a defendant to plead "a set-off on a counterclaim ... to any action...." The language "any action" is hardly susceptible of the construction plaintiff wishes to give it, namely, "any action arising out of the same facts."

*Bethlehem Steel Corporation v. Chicago Eastern Corporation*, No. 80 C 4296, slip op. at 2 (N.D.Ill. June 23, 1981) (motion for reconsideration denied July 24, 1984). *See also Hernas v. City of Hickory Hills*, 507 F.Supp. 103, 105 (N.D.Ill.1981) (stating that the provision extends to all counterclaims, even counterclaims not related to the original claim). We therefore hold that Chicago Eastern's counterclaim was timely filed under paragraph 13–207.

### B.

■ The second issue on appeal is whether the district court properly granted Bethlehem's motion for a directed verdict on Chicago Eastern's claim that Bethlehem breached the implied warranty of merchantability applicable to the steel acquired in the first purchase. Bethlehem's motion was made after Chicago Eastern concluded presenting its evidence relating to its implied warranty claims. In cases where the district court's jurisdiction is based on diversity of citizenship, state law governs the standard for determining whether a motion

---

4. Bethlehem relies on *Rebaque v. Forsythe Racing, Inc.*, 134 Ill.App.3d 778, 89 Ill.Dec. 595, 480 N.E.2d 1338 (1985) in support of its position. We do not find *Rebaque* instructive on the issue before us. In *Rebaque,* the court ruled that although the general rules of Illinois procedure provided for counterclaims and set-offs based on separate transactions, paragraph 2–717 of the Uniform Commercial Code specifically limited the right of set-off to claims under some contract. *Id.* 89 Ill.Dec. at 599, 480 N.E.2d at 1342. In contrast, as discussed *infra,* there is no similar conflict between paragraphs 2–725 and 13–207.

5. It should be noted that paragraph 13–207 does not allow a party who has inadvertently allowed the applicable statute of limitations to elapse to rejuvenate this action as a counterclaim by merely purchasing more goods and refusing to pay. In such a situation the seller's action for nonpayment will arise after the time permitted for the buyer's initial suit has passed and paragraph 13–207 will not apply. Of course, a buyer who had the good fortune to purchase additional goods prior to the time the initial suit inadvertently became time-barred can get a second chance by not paying and then counterclaiming.

for a directed verdict should be granted. *McMahon v. Eli Lilly and Co.*, 774 F.2d 830, 832 (7th Cir.1985). Under Illinois law, "verdicts ought to be directed ... only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria and Eastern R.R.*, 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967). On appeal, we apply the same standard. *Cincinnati Insurance Co. v. City of Taylorville*, 818 F.2d 1345, 1348 (7th Cir.1987).

Under Illinois law, if the seller of goods is a merchant of goods of the kind being sold, a warranty that the goods are "merchantable" is implied into a contract for their sale as a matter of law, unless otherwise expressly excluded or modified. Ill. Rev.Stat. ch. 26, paras. 2–314(1) and 2–316. Chicago Eastern and Bethlehem agree that the first purchase included an implied warranty that the steel sold by Bethlehem would be "merchantable." The minimum criteria for determining merchantability is set forth in paragraph 2–314(2)(a)–(f).[6] Chicago Eastern claims that the factors particularly relevant to the present dispute are those enumerated "(b)" and "(c)" in the statute. Paragraph 2–314(2)(b) requires that goods, if fungible, be of "fair average quality within the [contract] description," while 2–314(2)(c) states that goods must be "fit for the ordinary purposes for which such goods are used." Chicago Eastern contends that it introduced evidence at trial from which a reasonable juror could conclude that the steel acquired from Bethlehem in the first purchase failed to satisfy these two requirements and that the dis-

trict court therefore erred in granting Bethlehem's motion for a directed verdict.

Prior to trial, Bethlehem and Chicago Eastern stipulated to a number of facts. The parties agreed that Chicago Eastern submitted an order for steel sheets to be manufactured by Bethlehem and that confirmation of the first purchase was memorialized on two Chicago Eastern purchase orders. The first purchase order, dated February 4, 1976, states that Chicago Eastern ordered sheet steel of a type designated by the American Society of Testing Materials (ASTM) as "446 Grade C." The second confirmation, a supplement to the first confirmation, did not use the ASTM designation; rather it specified a certain chemical composition and maximum yield strength: ".14–.20 carbon yield to 40,000 PSI after roll forming."

Chicago Eastern acknowledges that it received steel that complied with the requirements necessary to qualify as ASTM 446 Grade C and the requirements specified in the second purchase order.[7] Chicago Eastern also acknowledged at oral argument that the steel would pass without objection in the trade under the contract description. It argues, however, that the steel was not merchantable because the steel was subjected to a renitrogenization process—a process not traditionally used with steel of this designation. Under this process, the nitrogen content of the steel was substantially increased. This increased the yield strength of the steel, but also made the steel more brittle and more susceptible to fracturing upon sudden impact. In other words, Chicago Eastern admits that the steel it received from Bethlehem did indeed possess the properties necessary to comply with the ASTM designation it ordered, but

---

6. Paragraph 2–314(2) provides that:
 Goods to be merchantable must be at least such as
 (a) pass without objection in the trade under the contract description; and
 (b) in the case of fungible goods, are of fair average quality within the description; and
 (c) are fit for the ordinary purposes for which such goods are used; and
 (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and
 (f) conform to the promises or affirmations of fact made on the container or label if any. Ill.Rev.Stat. ch. 26, 2–314(2).

7. The parties also stipulated that "[Chicago Eastern] does not contend that the steel sheets [did] not comply with ASTM 446 Grade C, nor does [Chicago Eastern] contend that the steel sheets do not have a yield strength of 40,000 PSI."

argues that the steel also possessed additional properties as a result of the renitrogenization process that made the steel unmerchantable. In the procedural posture of this case, the specific inquiry is whether Chicago Eastern introduced evidence from which a reasonable juror could conclude that steel which admittedly was ASTM 446 Grade C steel, was also less than "fair average quality within the [contract] description" and not "fit for the ordinary purposes for which such goods are used."

Chicago Eastern points to the testimony of its expert, Professor David W. Levinson, as evidence introduced at trial from which a reasonable juror could conclude that the steel acquired from Bethlehem in the first purchase was not merchantable. Levinson testified that although there was no specific prohibition against using the renitrogenization process in the production of ASTM 446 Grade C steel, the amount of nitrogen was 25 to 50 times higher than the level found in typical steel of this designation and that this amount of nitrogen "is added to very few steels." He further testified that this amount of nitrogen increased the yield strength of the steel, but also raised the "transition temperature" of the steel. Levinson explained that the transition temperature is the temperature below which fractures in a steel are substantially brittle and above which they are substantially ductile. This distinction is important because steel above the transition temperature stretches before it fractures. More pressure is therefore required to cause a ductile fracture than a brittle fracture.

Levinson testified that after examining samples of the fractured steel from the grain bins that it was his opinion that the fractures were brittle and not ductile. He also noted that tests conducted by third parties indicated that the transition temperature of the fractured steel was substantially higher because of the renitrogeniza-

tion process than it otherwise would have been. Chicago Eastern's direct examination of Levinson culminated with his agreement that the renitrogenized steel was unsuitable "for use as a wall sheet in a grain tank which could be erected anywhere in the United States." Chicago Eastern contends that this was evidence which indicated that the steel acquired from Bethlehem was not of fair-average quality under the contract description and that the steel was not fit for the ordinary purposes for which such steel is used. In Chicago Eastern's view, Levinson's testimony provided sufficient evidence that the Bethlehem steel was not merchantable and therefore the warranty of merchantability issue should have been presented to the jury.[8]

Even viewing the evidence presented at trial in the light most favorable to Chicago Eastern, we hold that no reasonable juror could conclude that the steel acquired from Bethlehem was not merchantable. All the evidence introduced by Chicago Eastern, including Levinson's testimony, was directed towards showing that the steel acquired in the first purchase was unfit for use as wall sheets in grain storage bins. Merchantability, however, does not look only at the particular use to which the buyer puts the goods. Rather, Uniform Commercial Code Comment 7 states that paragraph 2–314(2)(a) and (b) are to be read together and refer "to the standards of that line of the trade which fits the transaction and the seller's business." Ill.Rev.Stat. ch. 26, para. 2–314 comment 7. It is therefore appropriate to analyze the transaction from the selling merchant's perspective. Bethlehem is in the business of selling unfinished steel products, including ASTM 446 Grade C steel. Chicago Eastern was required to show the ordinary purposes for which this type of steel is used and that the renitrogenization made the steel acquired from Bethlehem unfit for these purposes. This Chicago Eastern did not do.

---

**8.** Chicago Eastern also points to a comment made during Bethlehem's cross-examination of Levinson where he stated: "[a] designer would not ordinarily include a material which showed a brittle fracture at an anticipated service temperature and condition in a design or use of a material for that application." But this general statement was never developed by Chicago Eastern. Indeed, Levinson later specifically testified in cross-examination that he did not know either the weather conditions or the stresses which existed at the time any of the grain bin fractures occurred.

Chicago Eastern has not pointed to any evidence presented at trial on the ordinary uses of this type of steel or how the renitrogenization affected these uses, nor has Chicago Eastern directed us to any place in the record where it introduced evidence showing that use as wall sheets in grain bins was in fact an ordinary use of this type of steel. In addition, Chicago Eastern did not introduce evidence that the increased nitrogen made the steel below fair-average quality. Levinson's testimony indicated that the nitrogen increased the transition temperature and made the steel more brittle, but that it also increased the yield strength of the steel. The steel was therefore not defective in the typical warranty of merchantability sense because the nitrogen that allegedly made the product defective by making the steel too brittle also had the seemingly desirable effect of making the steel stronger. It seems possible that different uses of steel require a different balancing of the apparent trade-off between strength and brittleness. We do not hold that steel subjected to this process is merchantable under the ASTM 446 Grade C description, rather we hold only that Chicago Eastern failed to offer evidence that it was not. Chicago Eastern was required to introduce evidence that the brittleness of the steel, regardless of the improved strength, made this steel unfit for the ordinary uses of ASTM 446 Grade C steel; no such evidence was introduced.[9]

### C.

In addition to its merchantability claim, Chicago Eastern alleged that the steel acquired from Bethlehem in the first purchase violated an implied warranty of fitness for a particular purpose ("the particular purpose warranty") which Chicago Eastern claims was applicable to the sale. Unless otherwise modified, the particular purpose warranty arises when a seller knows or has reason to know: (1) the particular use for which the acquired goods are to be put, and (2) that the buyer is relying on the seller's skill and judgment to select the appropriate product for the task. Ill.Rev.Stat. ch. 26, para. 2–315; Illinois Code Comment. Bethlehem stipulated that it knew or had reason to know that the steel sold to Chicago Eastern would be used as wall sheets in the construction of grain storage bins. Bethlehem argued at trial, however, that (1) it did not know that Chicago Eastern was relying on Bethlehem's skill and judgment to select the appropriate steel, and (2) that Chicago Eastern did not in fact rely on Bethlehem. The jury returned a verdict in favor of Bethlehem.

Chicago Eastern challenges the jury's verdict on the ground that it was induced by an improper jury instruction. In addition to setting forth the elements necessary to establish the existence of a particular purpose warranty and a breach thereof, the district court instructed the jury that:

> If a buyer has taken upon himself the responsibility of furnishing technical specifications, you may find that he is not relying on the seller's skill or judgment and no implied warranty of fitness for a particular purpose exists. Whether or not the buyer furnished technical specifications is for you to decide.[10]

---

9. Indeed, Chicago Eastern conceded at oral argument that the steel it acquired would pass without objection under the contract description of ASTM 446 Grade C steel. Although this designation does not speak to brittleness or provide for a particular level of nitrogen, if the steel was in fact too brittle to be used for ordinary purposes it is difficult to understand how it would pass without objection in the trade.

10. The complete jury instructions on the issue of implied warranty of fitness for a particular purpose were as follows:

> For CEC to succeed on its claim that Bethlehem breached the implied warranty of fitness for a particular purpose, CEC must prove by a preponderance of the evidence each of the following four elements: One, the seller, Bethlehem must have reason to know the buyer's, CEC's, particular purpose. The seller must have reason to know the buyer is relying on the seller's skill or judgment to furnish appropriate goods. That was the second. The third, buyer must, in fact, rely upon the seller's skill or judgment. And four, buyer's damages, if any, must be caused by the unsuitability of the goods furnished by the seller.
> If you find from your consideration of all the evidence that each of these four elements has been proved, then your verdict should be for CEC. But if on the other hand you find from your consideration of all the evidence that

Chicago Eastern apparently acknowledges that the instruction "states a proposition of law that is correct in the abstract," but argues that it was inappropriate in this case. Appellant's Reply Br. at 13. Chicago Eastern claims that the "technical specifications" instruction foreclosed inquiry into whether or not Chicago Eastern relied on Bethlehem and whether Bethlehem knew or should have known of this reliance. In Chicago Eastern's view, once this jury instruction was given the issue was resolved in Bethlehem's favor because it was undisputed that Chicago Eastern ordered and received ASTM 446 Grade C steel.

On appeal, jury instructions are reviewed "in their entirety and not in artificial isolation." *Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1117 (7th Cir.1983). "Reversal is inappropriate unless the jury's understanding of the issue was seriously affected to the prejudice of the complaining party." *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 597 (7th Cir.1985) (citation omitted). We find that Chicago Eastern failed to satisfy its burden in this case.

When a buyer orders a product, the extent of the description of the product can vary broadly. At one extreme is the situation where the buyer does not describe the product itself at all; rather the buyer describes what the product must do and allows the seller to determine the appropriate product to accomplish the task. This is the paradigm case where the particular purpose warranty arises. The seller knows the buyer is relying on the seller to select the best product to do the job; the risk of loss is therefore allocated to the seller. At the other extreme is the situation where the buyer describes each detail of both the product and the manufacturing process used to produce it. In this situation the buyer is relying on its own expertise, not the seller's. The buyer therefore appropriately bears the risk of loss when the product is manufactured in accordance with the buyer's direction, but the product does not function as anticipated; a particular purpose warranty does not arise.

In this case, the parties agree that Chicago Eastern ordered the steel acquired in the first purchase by an industry trade name, ASTM 446 Grade C. The Uniform Commercial Code as adopted in Illinois (and virtually every other state) modified prior law. Previously, a particular purpose warranty did not arise when the buyer ordered goods using the product's trade name. This rule was changed by the Uniform Commercial Code and now a buyer who orders goods by a trade name is not automatically precluded from bringing a particular purpose warranty claim. Designating a product by its trade name "is only one of the facts to be considered on the question of whether the buyer actually relied on the seller, ... it is not of itself decisive of the issue." Ill.Rev.Stat. ch. 26, para. 2–315 Uniform Commercial Code Comment 5. Even under the Code, however, if the buyer does in fact furnish detailed technical specifications such that the buyer has not relied on the seller, then no particular purpose warranty arises.

The district court's "detailed technical specifications" instruction merely described that situation where the buyer has specified with such detail that no reliance has in fact occurred. To determine whether a product order amounted to a technical specification, the jury would examine the detail provided in the order and the context in which the order was placed, including the comparative knowledge of the parties. In other words, the jury would look at substantially the same factors traditionally used to determine whether the buyer relied on the seller.

The thrust of Chicago Eastern's argument is that the jury was not permitted to exercise independent judgment on the issue of reliance. The jury instruction, however,

any one of these four elements has not been proved, then your verdict should be for Bethlehem.

If a buyer has taken upon himself the responsibility of furnishing technical specifications, you may find that he is not relying on the seller's skill or judgment, and no implied warranty of fitness for a particular purpose exists. Whether or not the buyer furnished technical specifications is for you to determine.

did not state that ASTM 446 Grade C was a technical specification; this issue was specifically left for the jury to resolve. Chicago Eastern argued at trial, as it does to us on appeal, that the ASTM designation only specified certain properties of the steel it acquired from Bethlehem, not all the essential properties, and it therefore relied on Bethlehem to provide steel that could be used in the wall of grain bins. We decline to assume that the jury did not follow the instruction to independently reflect on this issue. We hold that the jury instructions, when read as a whole, conveyed to the jury the correct message.

## D.

■ Chicago Eastern next contends that the district court erred in permitting Bethlehem to introduce certain evidence which suggested that design defects, not faulty steel, caused the fractures in the walls of the grain bins built by Chicago Eastern. During re-cross-examination of Donald Fescenmeyer, Chicago Eastern's vice president of purchasing, Bethlehem's attorney asked Fescenmeyer to read the first sentence from a 1979 Chicago Eastern internal memorandum. This sentence stated:

Armco [a testing agency] is planning to assist Chicago Eastern Corporation in finding if our present material could become overstressed due to our present designs. Armco does not feel that the basic problem is a material problem, but a design problem.

At trial, the district court specifically recognized that this evidence was hearsay as to the causation issue and could not be admitted to show that Chicago Eastern's design, not Bethlehem's steel, caused the fractures. The district court ruled, however, that the statement was admissible for the limited purpose of impeaching Fescenmeyer's testimony as to his state of mind at the time he made the second order from Bethlehem.

Chicago Eastern argues, without citing to any legal authority, that this evidence "improperly suggested" that design defects caused the tanks to fracture and was "undoubtedly prejudicial." Chicago Eastern does not directly challenge the admissibility of the evidence for impeachment purposes, but apparently contends that the prejudicial effect of this evidence on the issue of causation outweighed its probative value as to Bethlehem's fraud claim and should have been excluded under Federal Rule of Evidence 403. We review the district court's balancing of these competing interests under an abuse of discretion standard.

The essence of Bethlehem's fraud claim was that Fescenmeyer knew that the grain bins fractured because of a design defect, but decided to pass the burden to Bethlehem by ordering additional steel with no intention to pay for it. Chicago Eastern contended that Fescenmeyer believed that the steel acquired in the first purchase was defective and that it was merely claiming a proper offset. Fescenmeyer's state of mind and knowledge as to the possible causes of the fractures at the time he ordered the second batch of steel was therefore a key issue in Bethlehem's fraud suit. The 1979 memo was used by Bethlehem's counsel to refresh Fescenmeyer's memory on the stand as to his knowledge at the time he placed the order for the second purchase. Fescenmeyer acknowledged the substance of the memo, but the details of Armco's critique of Chicago Eastern's designs were not developed and the memo itself was apparently not admitted into evidence. Given the importance of the evidence to the fraud claim and the limited scope of its admission, we do not find that the district court abused its discretion in finding that the probative value outweighed any prejudicial effect. We hold that the evidence was properly admitted.[11]

11. Chicago Eastern also claims that the former head of Bethlehem's metallurgy department, Donald Mongeon, was improperly permitted to testify, after reviewing the same reports relied on by Levinson, that "the pattern of failures seems to occur geometrically on the bin." Chicago Eastern contends that this was unfairly prejudicial. We disagree. The district court sustained Chicago Eastern's objection for lack of foundation and this line of questioning ceased. Rather than establishing the necessary foundation, Bethlehem pursued another ap-

### E.

■ Chicago Eastern also appeals from the dismissal of the tort count set forth in paragraph 4 of its counterclaim. Paragraph 4 states:

The aforesaid steel was negligently and defectively manufactured by Bethlehem so that after erection the grain tanks and bins manufactured and sold by [Chicago Eastern] utilizing the aforesaid steel sustained severe cracking and splitting.

The complaint further alleged that because of Bethlehem's negligence, Chicago Eastern "sustained substantial damages for claims for repair and replacement of the defective steel sheeting and damages appurtenant thereto."

On March 4, 1982, the district court granted Bethlehem's motion to strike paragraph 4 relying on the Illinois Supreme Court's decision in *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982). *Moorman* held that a party seeking to recover economic loss could only proceed under contract theories; tort theories were unavailable. Chicago Eastern later moved on two separate occasions to have the district court reconsider its March 4 ruling in light of two subsequent Illinois decisions which permitted third-party plaintiffs to bring an action for implied indemnification to recover economic loss. *Maxfield v. Simmons*, 107 Ill.App.3d 341, 63 Ill.Dec. 190, 437 N.E.2d 839 (5th Dist.1982) *rev'd* 96 Ill.2d 81, 70 Ill.Dec. 236, 449 N.E.2d 110 (1983); *Anixter Brothers, Inc. v. Central Steel & Wire*, 123 Ill.App.3d 947, 79 Ill.Dec. 359, 463 N.E.2d 913 (1st Dist. 1984). These cases appeared to create a limited exception to the *Moorman* rule. The district court denied Chicago Eastern's motions to reconsider, issuing memorandum opinions

on February 12, 1985, and December 6, 1985. We now address the relationship between the rule announced in *Moorman* and the decision reached in *Maxfield*. Because we believe there is a great deal of uncertainty and complexity in this area of Illinois law, we discuss the district court's decision and the Illinois cases in some detail.[12]

### 1.

In *Moorman*, the plaintiff sued in both contract and tort for losses resulting from fractures which developed in the walls of a grain storage tank. The Illinois Supreme Court distinguished between economic loss on one hand and personal injury and damage to other property from a sudden or dangerous occurrence on the other. *Moorman*, 61 Ill.Dec. at 752–53, 435 N.E.2d at 449–50. "The demarcation between physical harm or property damage on the one hand and economic loss on the other usually depends on the nature of the defect and the manner in which the damage occurred." *Id.* at 752, 435 N.E.2d at 449 (citation omitted). The court stated that economic loss is characterized by damage to the product from deterioration and internal breakage. *Id.* It then ruled that Moorman Manufacturing's suit for the cost of repairing the fractured grain tank and any loss from the inability to use the tank was a suit to recover economic losses. *Id.* at 753, 435 N.E.2d at 450. Having distinguished economic loss from personal injury, the Illinois Supreme Court further ruled that in a suit for economic loss a plaintiff's only remedy is in contract. *Id.* The court noted that the law of sales was carefully drafted to allow the parties to allocate the risk of loss between themselves through negotiation over implied and express warranties. *Id.* at 750, 435 N.E.2d at 447. It stated that

---

proach and Mongeon's testimony culminated with his statement that there was insufficient information available in the material reviewed by Levinson to give a judgment as to what caused the fractures in the grain bins. Even viewing this testimony in conjunction with the other evidence challenged by Chicago Eastern, we do not find this evidence unfairly prejudicial.

12. In paragraph 7 of its counterclaim, Chicago Eastern asserted that Bethlehem's actions constituted "a tortious misrepresentation of the quality of the goods sold to [Chicago Eastern]." This paragraph was also dismissed by the district court. *Moorman* holds that economic loss is not recoverable under a theory of negligent misrepresentation, 61 Ill.Dec. at 755–56, 435 N.E.2d at 452–53, and Chicago Eastern has apparently not appealed this issue.

although warranty rules "frustrate just compensation for physical injury, they function well in a commercial setting." *Id.* The court therefore held that tort remedies were not available in suits for economic loss because to permit such remedies would eviscerate the rules of warranty. *Id.* On the basis of this opinion, the district court granted Bethlehem's motion to dismiss Chicago Eastern's negligence count.

In arguing that the district court erred by granting Bethlehem's motion, Chicago Eastern relies on *Maxfield v. Simmons*, 70 Ill.Dec. 236, 449 N.E.2d 110, and *Anixter Brothers*, 79 Ill.Dec. 359, 463 N.E.2d 913. In *Maxfield*, a homebuilder was sued by the homeowner for breach of the parties' construction contract after problems developed with the home's roof; no tort theories were raised. The builder, in turn, filed a third-party complaint against the manufacturer and supplier of the roof trusses used in the home's construction (the third-party defendants). The Illinois Appellate Court, in a divided opinion, affirmed the trial court's dismissal of the third-party complaint. The majority reasoned that absent an express agreement for indemnification between the builder and the third-party defendants, the third-party defendants could not be compelled to indemnify the builder for damages resulting from the breach of the construction contract between the builder and the homeowner. *Maxfield*, 63 Ill.Dec. at 192, 437 N.E.2d at 841. One judge dissented.

Judge Karns, while concurring in the opinion of the court, wrote separately indicating that in his view, because there was no express indemnification agreement, the builder's sole remedy against the third-party defendants after *Moorman* was for breach of warranty under article 2 of the Uniform Commercial Code and that this claim was barred by the statute of limitations. *Maxfield*, 63 Ill.Dec. at 192, 437 N.E.2d at 841 (Karns, J., concurring). He observed that "the transaction involving the trusses was simply a sale of goods under the Uniform Commercial Code." *Id.* He then noted that under § 2–725, the statute of limitations applicable to the sale of goods, a suit must be commenced within four years after the goods are *delivered* to the purchaser (in this case the builder), regardless of the aggrieved party's lack of knowledge of the breach. He concluded:

> If the trusses were defective, they were defective at the time of delivery to [the third-party plaintiff]. The fact that the purchaser [third-party plaintiff] was sued and brought a third-party action against the seller could not extend the time within which the seller could be sued by the purchaser. This case suggests other problems involving the relationship of tort law and the law of sales which are discussed in ... [*Moorman*].

63 Ill.Dec. at 192, 437 N.E.2d at 841.

The Illinois Supreme Court reversed, holding that the builder had properly alleged an action under an implied contract for indemnification and that this action was not barred by either the statute of limitations or the decision in *Moorman*. The court reasoned:

> The third-party complaint alleges tortious conduct on the part of [the third-party defendants] sufficient to give rise to the right to indemnification and contribution in that it was the tortious conduct that caused the roof of the house in question to "buckle, bend and dip." The implied contract of indemnity arose from the contractual relationship between the parties but the liability, if any, imposed on [the third-party plaintiff] will be the result not of breach of contract, but of tortious conduct. Under the circumstances we fail to perceive why the situation here should differ from that in a products liability case.

70 Ill.Dec. at 238, 449 N.E.2d at 112.

The principle set forth in *Maxfield* was applied in *Anixter Brothers*, 79 Ill.Dec. 359, 463 N.E.2d 913. The supplier of brass tubing was sued for breach of contract by one of its customers who used the tubing in the manufacture of antennas. The supplier in turn filed a third-party complaint against the manufacturer of the tubing alleging both breach of implied warranty and breach of an implied contract for indemnification. The Illinois Appellate Court

held that an implied contract for indemnification was properly alleged and that under *Maxfield*, this type of action was not barred by the *Moorman* decision. *Id.* at 362, 463 N.E.2d at 916. The court also held that an implied contract for indemnification was subject to a 5–year statute of limitations that began to run when either judgment was entered against the defendant/third-party plaintiff or when settlement was reached. *Id.* at 364, 463 N.E.2d at 918.

Chicago Eastern argues to us, as it did to the district court, that it is in the exact same position as the third-party plaintiffs in *Maxfield* and *Anixter*. Chicago Eastern claims that it purchased steel from Bethlehem, used the steel in the grain bins it sold to its customers, and because the steel was defective, it was required to respond under its liability to its customers by replacing the sheets which fractured. In its motion to reconsider filed in the district court Chicago Eastern acknowledged that it had not been sued by its customers, but stated that it chose to promptly repair the bins rather than force its customers to bring suit. Chicago Eastern argued that the expenses incurred in making these repairs resulted because of Bethlehem's defective product and that its action was for indemnification, even if no suit was actually filed against it. It sought to have paragraph 4 reinstated. In a second motion to reconsider, Chicago Eastern attached a copy of a complaint recently filed against it by one of its customers arising from a defective bin.

The district court denied both of Chicago Eastern's motions to reconsider its prior judgment. In its opinion denying the first motion the court stated:

> The instant counterclaim does not involve an indemnity action. [Chicago Eastern] seeks its economic losses, and invokes the UCC's warranty provisions. To allow [Chicago Eastern] also to sue in tort effectively would eviscerate UCC §§ 2–314, 315, 714 and 715. Therefore, the

policy underlying the decision in *Moorman* also applies here, and *Moorman* bars [Chicago Eastern] from suing in tort.

*Bethlehem Steel Corp. v. Chicago Eastern Corp.*, No. 80 C 4296, mem. op. at 3 (N.D. Ill. Feb. 12, 1985).

Since the district court issued its orders denying Chicago Eastern's motions for reconsideration, this area of law has undergone further development. In *Allison v. Shell Oil Co.*, 113 Ill.2d 26, 99 Ill.Dec. 115, 115–16, 495 N.E.2d 496, 496–97 (1986), the Illinois Supreme Court ruled that following the enactment of the Illinois Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat. ch. 70, para. 301 et seq., "active-passive" implied indemnity was no longer a viable theory "for shifting the costs of tortious conduct among jointly liable tortfeasors." *Id.*[13]

The *Allison* court explained that, originally, implied indemnification was a restitutionary device under which a contract was implied in law "arising from the legal obligation of an indemnitee to satisfy liability caused by actions of his indemnitor." *Id.* at 117, 495 N.E.2d at 498 (citations omitted). The classic example of this form of implied indemnification arises when an employer is held liable to a third party for damages resulting from the negligent conduct of an employee. The employer is permitted to recoup his or her loss from the employee under the theory that the nature of the employer-employee relationship is such that a promise by the employee to indemnify the employer should be implied as a matter of law. In order to establish this "quasi-contractual right of indemnification," the indemnitee must show both that he or she has not acted wrongfully in any degree and that the parties had the type of legal relationship which the law recognizes as giving rise to an implied promise to indemnify. *Id.*

---

**13.** Section 302 of the Act provides:
Except as otherwise provided in this Act, where 2 or more persons are subject to liability in tort arising out of the same injury to person or property, or the same wrongful death, there is a right of contribution among them, even though judgment has not been entered against any or all of them.
Ill.Rev.Stat. ch. 70, para. 302.

Implied indemnification was expanded beyond this narrow "quasi-contractual foundation" in order to alleviate some of the harshness of Illinois' historical rule prohibiting contribution among jointly negligent tortfeasors. *Id.* at 118, 495 N.E.2d at 499. So called "active-passive" implied indemnity was based on the relative fault of the parties. Under the doctrine, the minimally culpable (passive) tortfeasor was allowed to shift his or her entire loss to the actively culpable tortfeasor. The *Allison* court reasoned that "[a]ctive-passive indemnity, like contributory negligence, perpetuates inequality by its inability to apportion loss and its refusal to grant any relief whatsoever to a party whose conduct is considered active regardless of how much or how little other tortfeasors are at fault." *Id.* at 120, 495 N.E.2d at 501 (citation omitted). Accordingly, the court ruled that the Joint Tortfeasors Act preempted active-passive indemnity. The court, however, specifically declined to express an opinion on the continued vitality of implied indemnity in cases where the claims for indemnification are "premised upon an underlying action regarding a defective product or the would-be indemnitees vicarious liability for the conduct of their indemnitor...." *Id.* at 116, 495 N.E.2d at 497 (citation omitted); [14] *see also Allison v. Shell Oil Co.: The Viability of Active–Passive Indemnity After Illinois Contribution Among Joint Tortfeasors Act,* 20 John Marshall Law Review 363, 363–64 (1986).

2.

Against this complex backdrop, we turn to Chicago Eastern's claim. In essence, Chicago Eastern is only attempting to recover from Bethlehem the losses incurred by Chicago Eastern's customers which were shifted to Chicago Eastern when it repaired its customers' fractured grain bins. The issue is under what legal theories, if any, can Chicago Eastern proceed against Bethlehem under Illinois law. The principal basis for the district court's decision to re-affirm the dismissal of paragraph 4 was its conclusion that implied indemnification could not be a remedy available to Chicago Eastern because it would undermine the policy announced in *Moorman.*[15]

---

14. In *Frazer v. A.F. Munsterman, Inc.,* 123 Ill.2d 245, 123 Ill.Dec. 473, 527 N.E.2d 1248 (1988), the Illinois Supreme Court ruled that a negligent party could not bring an action for indemnification against the manufacturer of a product who had previously settled with an injured party. The injured party had sued both the distributor of the product, A.F. Munsterman, Inc., and the manufacturer under strict liability and negligence theories. The manufacturer settled for $60,000. The case proceeded to trial against Munsterman. The trial court directed a verdict against Munsterman on the strict liability count. The jury then found Munsterman negligent and determined that the injured party had incurred damages of $365,000. Munsterman sought contribution and indemnification from the manufacturer. The Illinois Supreme Court held that (1) under the plain language of the Joint Tortfeasors Act, the manufacturer's good faith settlement barred any action for contribution, and (2) Munsterman's negligence prevented it from bringing an action for indemnification. The court reasoned, in part, that it would be unfair to permit a negligent party to shift the entire loss to the manufacturer and that such an outcome would undermine the Contribution Act. The court, however, continued to leave open the question of whether a nonnegligent distributor could sue the manufacturer for indemnification.

15. The district court also based its decision on its belief that Chicago Eastern failed to properly allege an action for implied indemnity because Chicago Eastern did not allege that it had been sued and had settled. In its order denying Chicago Eastern's second motion to reconsider, the court stated:

> Under Illinois law, a defendant may not sue for indemnity in an independent action until it has been found liable in the underlying action, or it has paid a settlement in that case. Therefore, even if we were inclined to consider allowing defendant to allege a separate indemnity count in its counterclaim at this extremely late date (which we are not), neither in its current motion to reconsider or its earlier motion, has defendant alleged the necessary facts for such a count.

*Bethlehem Steel Corp. v. Chicago Eastern Corp.,* No. 80 C 4296, mem. op. at 1–2 (N.D.Ill. Dec. 6, 1985) (order denying motion to reconsider orders of March 4, 1982, and February 12, 1985) (citations omitted).

Chicago Eastern's counterclaim alleged that it had "sustained substantial damages for claims for repair and replacement of the defective steel sheeting" as a result of Bethlehem's negligence. The district court apparently reasoned that because Chicago Eastern repaired its customers' grain bins when they complained of the fracturing without requiring these customers to bring a lawsuit, Chicago Eastern could not allege a claim for indemnification.

*Bethlehem Steel Corp. v. Chicago Eastern Corp.,* No. 80 C 4296, mem. op. at 3 (N.D. Ill. Feb. 12, 1985).

Assuming that Chicago Eastern's customers sustained only economic loss when their grain bins fractured, they would be confined to contract theories in any suits they might bring against Chicago Eastern; tort theories are not permitted under *Moorman* for economic loss.[16] These customers could not sue Bethlehem directly because they were not a party to any contract with Bethlehem. *See, e.g., Rothe v. Maloney Cadillac, Inc.,* 119 Ill.2d 288, 116 Ill.Dec. 207, 208, 518 N.E.2d 1028, 1029 (1988). *But see Moorman,* 61 Ill.Dec. at 759, 435 N.E.2d at 456 (Simon, J., concurring) (arguing that economic loss should be recoverable out of privity in some circumstances). Initially, therefore, only Chicago Eastern is on the hook.

The form of Chicago Eastern's potential recourse against Bethlehem is uncertain. Contribution as authorized under § 302 is inapplicable because it only applies where two or more persons "are subject to liability in tort."[17] If the customer is confined

to contract theories in his or her suit against Chicago Eastern, it is difficult to see how Chicago Eastern and Bethlehem could be jointly subject to tort liability under the Joint Tortfeasors Act.

If Chicago Eastern and Bethlehem had entered into an indemnification agreement, Chicago Eastern could have sued pursuant to its rights under the agreement, but no such agreement was executed. The type of dispute in which these parties are presently embroiled is not unique, and the possibility of such an action should have been readily foreseeable at the time of the sale. The thrust of *Moorman* is that commercial entities should bargain to allocate the risk of economic loss between themselves. Because Chicago Eastern apparently did not negotiate for an indemnification agreement, perhaps it is not unreasonable that Chicago Eastern should bear the loss. As previously discussed, however, this position was adopted by the Illinois Appellate Court in *Maxfield* but was reversed by the Illinois Supreme Court.

Although Chicago Eastern failed to obtain an indemnification agreement, it did

---

Although we have not located any authority directly addressing this issue, we are doubtful that this is the proper approach under Illinois law. In *St. Paul Fire & Marine Ins. Co. v. Michelin Tire Corp.,* 12 Ill.App.3d 165, 298 N.E. 2d 289 (1973), the Illinois Appellate Court stated:

> We hold that, in addition to proving the primary liability of the indemnitor for the injury occasioning a settlement, an indemnitee who settles without notice to the prospective indemnitor need prove only that, by settling, he was responding to a reasonable anticipation of personal liability rather than acting as a mere volunteer. The reasonableness of the amounts paid in settlement is a matter bearing solely upon the issue of damages.

*Id.* 298 N.E.2d at 292; *see also LeMaster v. Amsted Industries, Inc.,* 110 Ill.App.3d 729, 66 Ill.Dec. 454, 457, 442 N.E.2d 1367, 1370 (1982). The focus of the *St. Paul* court's reasoning is on whether the settlement was in "reasonable anticipation of personal liability." This in turn is largely unrelated to whether a lawsuit has actually been filed against the party seeking indemnification. In certain situations the likelihood of a lawsuit and eventual liability might be such that an indemnitee would decide that it is best advised to settle immediately. A rule requiring a lawsuit to actually be filed before an indemnification suit could be brought would force the indemnitee to refrain from settling in

order to preserve its cause of action. This would only impose additional costs on the parties without any corresponding benefit. The prospective indemnitor is protected from volunteer payments by the "reasonable anticipation" requirement the same as if a lawsuit was actually brought.

16. Chicago Eastern does not dispute that the losses arising from the fractures that occurred in its customers' grain bins, like the losses resulting from the fracture in the grain bin in *Moorman,* were economic losses. Although it seems unlikely, if someone was injured as a result of these fractures, this might constitute personal injury giving rise to a tort action. Chicago Eastern's counterclaim, however, which does state that Chicago Eastern sustained losses repairing the fractured grain bins, does not allege that it also settled claims for personal injury. We therefore assume that Chicago Eastern's customers sustained only economic loss.

17. Contribution is only available in Illinois for causes of action which arose on or after March 1, 1978. *Van Slambrouck v. Economy Baler Co.,* 105 Ill.2d 462, 86 Ill.Dec. 488, 475 N.E.2d 867 (1985). It is not clear from the record when Chicago Eastern's cause of action arose. It is possible that contribution is not applicable and, if so, it could not preempt implied indemnity.

bring an action under the implied warranty provisions of article 2 of the Uniform Commercial Code. The Illinois Supreme Court has emphasized that the law of sales has been carefully crafted to govern the economic relations between parties. *Moorman*, 61 Ill.Dec. at 750, 435 N.E.2d at 447. However, a difficulty that can arise for third-party plaintiffs bringing an action under article 2 is the statute of limitations applicable to the sale of goods. As previously noted, ¶ 2–725 provides a four-year limitations period from the time a purchaser *receives* the goods. The problem, as illustrated in *Maxfield*, is that this time period may elapse before the purchaser/third-party plaintiff is sued by the ultimate user and in turn can sue the third-party defendant. The Illinois Supreme Court's recognition of an implied contract for indemnification in *Maxfield* can be viewed as a narrow exception which attempts to address this problem.

Such a limited reading of *Maxfield* makes it easier to square with *Moorman*. There are essentially three lines of reasoning that were either invoked or could be utilized to justify the outcome reached in *Maxfield*. Each, however, quickly collides with entrenched principles of Illinois law.

First, the Illinois Supreme Court reasoned that the third-party defendant's tortious actions with respect to the ultimate user of the product made it appropriate to permit the third-party plaintiff to bring an action for indemnification. *Maxfield*, 70 Ill.Dec. at 238, 449 N.E.2d at 112. This reasoning, however, is difficult to reconcile with *Moorman* because it focuses on the third-party defendant's conduct. In contrast, the basic principle of *Moorman* is that the type of loss, not the defendant's conduct, is critical. When only economic loss is incurred, the plaintiff may only raise contract theories even if the defendant's alleged conduct constituted a tort as well as a breach of contract. A strict application of *Maxfield* leads to the curious result that Chicago Eastern's customers could not sue Bethlehem for its alleged negligence in manufacturing the steel because they sustained only economic loss, but Chicago Eastern, which also sustained only economic loss, may sue for indemnification because of Bethlehem's alleged negligence with respect to the grain bin purchasers.

Second, the *Maxfield* court analogized the third-party plaintiff's situation to a products liability suit. *Maxfield*, 70 Ill. Dec. at 238, 449 N.E.2d at 112. "Upstream" indemnification against the manufacturer of a defective product or component is permitted under the theory that the party placing the defective product in commerce should be held liable for the damage it causes. *Liberty Mutual Insurance Co. v. Williams Machine & Tool Co.*, 62 Ill.2d 77, 338 N.E.2d 857 (1975). "[W]here a defective condition in a product makes it unreasonably dangerous to the user, the public interest in human life and health require[s] imposing the loss upon the one creating the risk and reaping the profit." *Frazer v. A.F. Munsterman, Inc.*, 123 Ill. 2d 245, 123 Ill.Dec. 473, 527 N.E.2d 1248 (1988) (quoting *Suvada v. White Motor Co.*, 32 Ill.2d 612, 619, 210 N.E.2d 182 (1965)). The scope of this strict products liability concept, while potentially far-reaching, has been limited in Illinois both in direct and indemnification actions to situations where the party seeking redress establishes that the product is unreasonably dangerous. "[T]he unreasonably dangerous nature of a product has particular relevance when a personal injury results and to some degree when property damage occurs. It has little relevance to economic loss when neither personal injury nor property damage is involved." *Moorman*, 61 Ill.Dec. at 749–50, 435 N.E.2d at 446–47. The *Moorman* court therefore stated that the strict products liability theory was confined "to unreasonably dangerous defects resulting in physical harm to the ultimate user or consumer." *Id.* at 750, 435 N.E.2d at 447. If Chicago Eastern's customers incurred only economic loss, then Chicago Eastern itself could not have sustained anything other than economic loss. Accordingly, the products liability analogy is not very powerful.

Finally, as previously explained, implied indemnity originally derived from a quasi-contractual foundation under which the law

implied a contract between the indemnitor and the indemnitee on the basis of their pre-existing legal relationship. *See Allison*, 99 Ill.Dec. at 117, 495 N.E.2d at 498. It is possible that the *Maxfield* decision was based on the premise that the nature of the relationship between buyers and sellers of goods justifies implying a contract for indemnification between them. *But compare Van Slambrouck v. Economy Baler Co.*, 105 Ill.2d 462, 86 Ill.Dec. 488, 475 N.E.2d 867 (1985) (holding that a purchaser-seller relationship was insufficient to support a cause of action for "downstream" indemnity). Implying such an agreement, however, seems at odds with *Moorman's* emphasis of the role of negotiation between commercial parties in setting the terms of their deal and allocating the risk of economic loss. *See Moorman*, 61 Ill.Dec. at 750, 435 N.E.2d at 447. Of course, *Maxfield* could be read as establishing an implied indemnification agreement as the baseline rule which the parties could then negotiate away from if they chose. Under this theory, absent contrary agreement between the parties, a contract for indemnification would be deemed to exist as a matter of law. This theory, however, finds little support elsewhere in Illinois law. Further, it intrudes on article 2 of the Uniform Commercial Code which carefully maps out the responsibilities of parties to a contract for the sale of goods. Article 2 specifically provides for the warranties of merchantability and fitness for a particular purpose which are implied as a matter of law, but does not create an implied contract for indemnification.

The difficulty of fitting *Maxfield* within the broader themes of Illinois law is, in our view, indicative of the scope that the opinion should be given. The Illinois Appellate Court's separate opinions demonstrate that the troubling issue in *Maxfield* was the prospect that the parties in the middle of the distribution chain would be left without a remedy against those further up the chain. This is the same type of concern that sparked the development of active-passive indemnity. Yet the traditional active-passive indemnity doctrine, even assuming it is viable, is inapplicable because it is a vehicle to rectify the hardships which result when an injured party who can sue two or more tortfeasors chooses to sue only the minimally culpable party. In contrast, Chicago Eastern's customers were limited to suing only one party, Chicago Eastern, and were confined to contract theories.

Our efforts to interpret the scope of *Maxfield* are hampered by the fact that the elements of the implied indemnification cause of action recognized in the opinion are not set forth. The natural tendency may be to assume that Chicago Eastern could sue Bethlehem on some variation of the active-passive indemnification theory. Indeed, Chicago Eastern characterizes its cause of action as an "indemnity tort claim." This, however, yields an odd result. The product's ultimate consumer who suffers only economic loss is generally limited to suing the seller in contract as *Moorman* prescribes. In contrast, every other party in the distribution chain would have both a contract claim and the indemnification claim permitted in *Maxfield*. Suits in active-passive indemnity, however, "are in reality actions for ordinary negligence to recover damages from the indemnitor." *Allison*, 99 Ill.Dec. at 119, 495 N.E.2d at 500. If the cause of action recognized in *Maxfield* is construed to be a form of active-passive negligence, it leaves a very large hole in the *Moorman* economic loss doctrine because every party but the ultimate consumer can proceed under a type of tort theory. Without a clearer expression of such an intent from the Illinois Supreme Court, we decline to adopt such a reading.

We believe that *Maxfield* is a narrow exception that arose as a solution to the situation where the statute of limitations applicable to the implied warranty provisions had elapsed. In such a situation, the third-party plaintiff cannot sue under straight tort theories because of *Moorman* and cannot sue under implied warranty theories because of the statute of limitations. Absent express warranty provisions or an indemnification agreement, the third-party plaintiff could be held liable for product defects that are properly traced to the man-

ufacturer without any legal remedy against the manufacturer.

Chicago Eastern, however, was not barred by the statute of limitations from bringing its warranty claims because of the exception provided in ¶ 13–207. Chicago Eastern was therefore able to get to trial on its warranty theories exactly as *Moorman* contemplates. As the district court observed, "the policy underlying the decision in *Moorman* ... applies here, and *Moorman* bars [Chicago Eastern] from suing in tort." *Bethlehem Steel Corp. v. Chicago Eastern Corp.*, No. 80 C 4296, mem. op. at 3 (N.D.Ill. Feb. 12, 1985). The decision of the district court is AF-FIRMED.